NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2014-Ohio-2966

THE STATE OF OHIO, APPELLEE, *v.* OSIE, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Osie,* Slip Opinion No. 2014-Ohio-2966.]

*Criminal law—Aggravated murder—Death penalty affirmed.*

(No. 2010-1105—Submitted January 8, 2014—Decided July 10, 2014.)

APPEAL from the Court of Common Pleas of Butler County,

No. CR 2009-02-0302.

_____

KENNEDY, J.

{¶ 1} On February 14, 2009, appellant, Gregory C. Osie, stabbed David Williams to death in Williams's house in Liberty Township, Butler County. Osie was tried by a three-judge panel, which found him guilty of aggravated murder with three death specifications and sentenced him to death.

{¶ 2} David Williams was a partner in a business venture called United Contractors Unlimited ("UCU"), which began in August 2008. Williams had provided $10,000 in seed money to get the business started and also served as a business mentor, providing his partners with advice on running a business. The other partners performed various jobs in the business.

**{¶ 3}** Williams's partners in UCU included Robin Patterson and Nicholas Wiskur. Patterson was the office manager. Gregory Osie was Patterson's boyfriend. Osie was not a partner in UCU but had been employed on one occasion to do a job for UCU. He was also hired occasionally to do "odds and ends type jobs" for David Williams.

**{¶ 4}** By February 2009, according to Nicholas Wiskur, UCU had nearly reached "the point of being defunct." Wiskur testified that the partners held a financial meeting approximately every four weeks to go over profit-and-loss statements. At these meetings, the partners would "go over checks"; therefore, Wiskur knew that questions had been raised about certain checks.

**{¶ 5}** Wiskur decided to investigate one specific check: a check for $375, made out to and endorsed by Greg Osie, ostensibly signed by Robin Patterson, and dated December 26, 2008. This check had been cashed at a Marathon gas station. Because the account on which it was drawn had been closed, the check bounced. Based on his familiarity with Patterson's signature, Wiskur concluded that the check was "obviously forged." He called the Marathon station and discussed the matter with the owner. Wiskur subsequently discussed the matter with Williams.

The Events of February 13-14, 2009

**{¶ 6}** On February 13, 2009, between approximately 8:30 and 9:00 a.m., Wiskur went to Williams's house. Williams was not home, so Wiskur phoned him, then decided to await Williams's return.

**{¶ 7}** Before Williams arrived, Osie phoned Wiskur. Osie claimed that he didn't know anything about the forged check. Wiskur informed Osie that the owner of the gas station had "unequivocally" identified Osie as the person who had cashed the check and that Osie's act had been captured on videotape. Osie continued to deny that he had cashed the check. Wiskur told him: "It's all going

to come out, * * * if you did it or not. I guess * * * we'll find out, and at that time, we'll do the necessary actions * * *."

{¶ 8} Eventually, Williams came home, and he and Wiskur discussed other matters. However, before Wiskur left, Osie phoned Williams. Wiskur was able to hear and recognize Osie's voice on the other end of the line.

{¶ 9} Wiskur testified that the conversation was "[a]gitated and aggressive," with "some name calling on both sides" and references to the theft of money and property. During this conversation, according to Wiskur, Williams said to Osie: "Well, you know, I just want to make this right. Robin won't return any of my phone calls. * * * Well, I'm going to go to the police. I'm going to file charges. This needs to be taken care of." At the end of the conversation, according to Wiskur, Williams "slam[med] the phone" down and said, "F you."

{¶ 10} On the night of February 13-14, Tim Purvis, an acquaintance of Osie and Robin Patterson, was performing with a band at a local bar. Around 1:00 a.m., February 14, Purvis saw Patterson at the bar. Purvis finished playing at 2:00 a.m.; half an hour later, he left with Patterson. They reached Purvis's apartment around 2:45 a.m. Patterson stayed until 9:00 a.m. She and Purvis sat and talked and had "a couple of beers."

{¶ 11} While Patterson was at Purvis's apartment, her phone rang between 10 and 15 times, beginning sometime between 4:00 and 5:00 a.m. Around 5:00 a.m., Purvis got a phone call from Osie, who wanted to talk to Patterson. Purvis handed Patterson his phone and went to the bathroom. He was able to hear most of the conversation, however. He described it as "a lot of arguing back and forth."

{¶ 12} Around 5:30 or 6:00 a.m., Patterson received a text message that upset her. Purvis described her reaction: "She was very upset, pacing back and forth, crying. Just really distraught." Purvis asked why she was upset, and she said: "Greg killed Dave."

**{¶ 13}** Records of the Cincinnati Bell Telephone Company introduced at trial show that on February 14, 2009, between 3:07 a.m. and 8:45 a.m., 15 text messages were sent from phone number 513-746-1393 to phone number 513-746-8127. Cincinnati Bell records listed Osie as both subscriber and registered user for phone number 513-746-1393. Osie was also the subscriber for phone number 513-746-8127; the registered user of that phone was listed as "Robin."

**{¶ 14}** At 3:07 a.m., a text from Osie's phone to Robin's stated: "Baby doll your dirt is ready to be over." At 4:24 a.m., there was another text that said simply: "Job finished." Other texts sent from Osie's phone to Robin's that morning included "Need help" at 4:35 a.m., "Baby talk 2 me" at 5:09 a.m., "Help please" at 5:25 a.m., "I need you i am afraid" at 7:30 a.m., and "Baby im worried please call" at 8:29 a.m.

**{¶ 15}** Business records of PNC Bank and United Dairy Farmers ("UDF") show that on February 14, 2009, at 4:28 a.m., someone used David Williams's Visa debit card to buy $27.01 worth of gasoline at the UDF in West Chester. Business records of PNC Bank and Meijer show that on February 14, 2009, at 6:24 a.m., someone tried to use the same card to make a transaction in the amount of $547.66 at the Meijer store in West Chester, but the transaction was declined for insufficient funds.

**{¶ 16}** At approximately 9:00 or 9:15 a.m., February 14, Donald E. Heis Sr., a mechanic at an auto body shop in West Chester, spotted a cell phone lying in pieces in the driveway of the shop as he was driving out on a wrecker call. About 15 minutes later, on his way back, Heis stopped and picked up the phone. Heis reattached the loose pieces of the phone and found that it worked. By examining the phone's recent-call log, he obtained the phone number of Williams's daughter, Heather Williams, and called that number to see whether she knew who owned the phone. Heis explained where he had found the phone and

how he had obtained Heather's number. Heather said, "Oh, it's my dad's [phone]." Heis told her that she could come by the body shop and pick it up.

{¶ 17} Heather then called two of her father's friends and asked them to let him know where his phone was. She sent one of them to Williams's house. There he found Williams's body. Police were summoned, and the crime scene was processed.

The Crime Scene

{¶ 18} Williams was found lying on the living-room floor, bruised and blood-soaked. The body lay near a coffee table, where police found a wallet lying open, with business cards and various papers scattered around it. On a table by a recliner was a spillproof cup containing whiskey and a drinking straw.[1] Williams's television was missing from the entertainment center in the living room.

{¶ 19} In the kitchen, police found a set of knives in a wooden block on the counter. One knife from the set appeared to be missing, but was found in a kitchen drawer.

{¶ 20} Williams's bedroom contained a safe, which sat atop a dresser. The safe was open, and papers and other items lay scattered on the floor in front of the dresser.

The Autopsy

{¶ 21} Dr. James Swinehart, a forensic pathologist employed by Butler County, performed an autopsy on Williams's body on February 14. Dr. Swinehart noted that Williams had suffered "five distinct stab wounds clustered basically around the left nipple area." Several of these wounds had perforated Williams's left lung, collapsing it. Dr. Swinehart measured 700 cc of blood in the

---

[1] Williams's daughter and physician testified that Williams had a severe genetic disorder known as "essential tremor" or "familial tremor," which caused his whole body to shake so badly that he could not drink without a straw, use silverware, or negotiate steps.

left chest cavity. Williams had also sustained five stab wounds to the abdomen, one of which damaged his liver and gall bladder.

{¶ 22} Finally, Williams's throat had been slashed. Dr. Swinehart identified "two large incised wounds of the anterior neck." The more serious of these wounds was 5 and 3/4 inches long; it penetrated Williams's larynx with a "through and through" wound and exposed his windpipe.

{¶ 23} Dr. Swinehart concluded that Williams bled to death. Based on the temperature of Williams's body at 8:00 p.m., February 14, Dr. Swinehart was able to estimate that Williams had died in the early morning of February 14, sometime between midnight and 4:00 or 5:00 a.m. Given the large amount of sudden blood loss, Dr. Swinehart opined that Williams would have died within 15 minutes.

{¶ 24} Finally, Dr. Swinehart had a comprehensive toxicology screen performed, which revealed that Williams had a postmortem blood-alcohol level of .160 percent.[2]

Osie's Arrest and Interrogation

{¶ 25} Investigators from the Butler County Sheriff's Office determined that Osie was a suspect. Four detectives went to his address in West Chester to talk to him. They knocked on the door of his apartment, but no one answered. As the detectives were leaving the apartment complex, they noticed a red truck in the parking lot with its headlights on. Osie drove a red truck. The truck "peeled out" in reverse. The detectives pursued the truck in their vehicles and were able to block its departure. When the driver of the red truck identified himself as Osie, the detectives handcuffed him and drove him to the stationhouse.

{¶ 26} At the station, the detectives placed Osie in an interview room, where they administered *Miranda* warnings and proceeded to interrogate him.

---

[2] Alcohol tends to calm the shaking experienced by patients with essential tremors. Heather Williams testified that her father drank alcohol to help him function better.

{¶ 27} Osie initially told detectives that Williams had attacked him. According to Osie, Williams accused Patterson of stealing from him and said that "he was going to go press charges against her." Osie claimed that after he told Williams, "[Y]ou got to have proof before you do something like that," Williams became angry. Osie said that he started to leave, whereupon Williams got out of his chair, picked up a knife and came at Osie.

{¶ 28} Osie claimed that he pushed Williams back into his chair, but Williams got up and attacked him again. Osie then grabbed Williams's hand, "kind of turned it into him," and stabbed Williams with the knife while Williams was holding it. In Osie's account, Williams pulled the knife out of his body and attacked Osie yet again. The knife "went back in him again, the way that I had his hand." Then, Osie claimed, he panicked and went home. Osie claimed that when he left, he did not even know that Williams was dead.

{¶ 29} The detectives asked Osie why he had sent Patterson a text to the effect that she didn't "have to worry about Dave no more" if he was unaware that Williams was dead. Osie explained that this was intended "[t]o let her know that I kind of beat Dave up and stabbed him."

{¶ 30} The detectives continued to confront Osie with inconsistencies in his story and inconsistencies between his story and the evidence. As they did so, Osie's story changed. After admitting that he "kind of beat Dave up," Osie denied beating Williams, admitting only that he had "punched him one time." Osie then amended that to "[o]ne or two times maybe." Then he claimed that he had not punched Williams with his fist, but had hit him with an open hand. Finally, he admitted punching Williams in the face.

{¶ 31} Osie initially claimed that he stabbed Williams only twice, and he denied cutting Williams's throat. When detectives pointed out that there appeared to be four to six stab wounds, Osie said he didn't know whether anyone else was in the house when he left, implying that someone else might have inflicted the

wounds after Osie left. Osie later suggested that Williams might have inflicted some of the wounds on himself. Still later, Osie admitted stabbing Williams "probably four to five times," but denied cutting his throat. Finally, however, Osie admitted that he cut Williams's throat after stabbing him.

{¶ 32} Osie denied taking Williams's cell phone or television, and he denied taking the knife from the house, claiming that he had left it in Williams's body. He also denied removing anything from Williams's safe.

{¶ 33} Eventually, Osie admitted that he took keys from Williams's jacket, then went into the bedroom, opened the safe, and scattered its contents. He admitted that he took the knife with him when he left. He also admitted taking Williams's cell phone, which he threw from his truck window on his way home, and Williams's TV, which he took in order to make the crime look like a robbery. He claimed that he drove home, changed clothes, then drove to Cincinnati. There he discarded the TV in a dumpster, then threw the knife into the Ohio River.

{¶ 34} After this interview, Detective Melissa Gearhart learned about Williams's tremor disorder. This called into question Osie's claim that Williams had assaulted him with a knife, so Gearhart interviewed Osie again.

{¶ 35} In this second interview, Osie's story was that he and Williams got into a scuffle, during which Osie punched Williams a few times. Then Osie went into the kitchen, Williams followed him, and they struggled again. During the second struggle, Osie grabbed a knife. Williams backed away from Osie into the living room. There, Osie stabbed Williams in the chest. Williams fell to the floor, and Osie stabbed him a few more times. Then, motivated by anger, he cut Williams's throat, but only once.

Osie's Statements to His Cellmate

{¶ 36} Donald D. Simpson Jr., an acquaintance of Osie's, was Osie's cellmate in the Butler County Jail from February 15, 2009, until Simpson's release in April 2009. A "couple of weeks" after moving in, Osie began to

discuss his case with Simpson. During that time, according to Simpson, the two talked about Osie's case "pretty much every day" until Simpson's release, because "that's all [Osie] pretty much had to do."

**{¶ 37}** Osie told Simpson that he had been charged with the murder of David Williams, and "it all stimulated [sic] over Greg's girlfriend, Robin Patterson." Simpson testified: "Greg had told me that David Williams was pressing charges on Robin Patterson for stealing around $18,000." Osie told Simpson that Patterson had used payroll checks to steal the money and that she asked him to persuade Williams not to press charges.

**{¶ 38}** According to Simpson, Osie also gave him an account of Williams's murder. Osie told Simpson that before he went to Williams's house, he and Patterson had spent all day getting high on cocaine. Osie told Simpson that he arrived at Williams's house around 1:30 or 2:00 a.m. Osie began by trying to talk Williams out of pressing charges. But during the conversation, Williams indicated his intention to press charges against Osie for the check cashed at the Marathon station. At that point, Osie told Simpson,

> the conversation had got heated and * * * he had punched Dave, and then it just happened that, I mean before he knew it, he had got the knife and stabbed him. He had stabbed him like four or five times in the chest, and that then when he was laying there, that he freaked out, and so he had rushed down and took the knife and sliced his throat.

**{¶ 39}** Osie told Simpson that he "had tried to make it look like a break-in." Osie told Simpson that he took a flat-screen television and a credit card and also removed checks from Williams's safe. Osie said that he had tried to purchase gas with the credit card. He also had gone to Meijer and tried to buy a

diamond ring for Patterson, but the card was declined. Simpson testified that Osie never told him that before arriving at Williams's house, he had intended to harm Williams or steal anything.

{¶ 40} According to Simpson, Osie had been calling and writing Patterson, but Patterson refused to take Osie's calls or answer his letters. Shortly before Simpson's scheduled release, Osie asked him what his plans were; Simpson said that he was going back to Kentucky. Osie asked him to "stick around for a couple of days and do him a favor." Osie wanted Simpson to "find the murder weapon and place it in Mrs. [Robin] Patterson's car." Osie described the weapon as a 12-inch hunting knife. He told Simpson that he had thrown it from the window of his vehicle and gave Simpson directions for finding it.[3]

Indictment, Trial, and Verdict

{¶ 41} Osie was indicted on two counts of aggravated murder: one charging that he killed Williams with prior calculation and design, R.C. 2903.01(A), and one charging that he killed Williams while committing aggravated burglary, R.C. 2903.01(B). Each aggravated-murder count carried three death specifications. Specifications 1 and 2 to each count were felony-murder specifications, R.C. 2929.04(A)(7), predicated respectively on aggravated burglary and aggravated robbery. Specification 3 to each aggravated-murder count was a witness-murder specification, R.C. 2929.04(A)(8). Counts 3, 4, and 5 charged aggravated burglary, aggravated robbery, and evidence tampering, respectively.

{¶ 42} Osie waived a jury and was tried by a three-judge panel. The panel found Osie guilty of Count 2 (felony-murder) and of all three death specifications attached to that count. However, the panel acquitted him on Count 1 (aggravated

---

[3] Simpson was not asked whether he actually looked for the knife. No such knife was introduced at trial.

murder/prior calculation and design) and found him guilty of the lesser-included offense of murder. Finally, the panel found him guilty of Counts 3, 4, and 5.

**{¶ 43}** After the penalty phase, the panel sentenced Osie to death on Count 2. The case is now before this court on appeal as of right.

I. Pretrial Issues

A. Validity of Jury Waiver

**{¶ 44}** In his tenth proposition of law, Osie contends that his jury waiver was not voluntary, knowing, and intelligent. He claims that the waiver colloquy was inadequate and that the trial court should have inquired into his mental health before accepting the waiver.

**{¶ 45}** A jury waiver must be voluntary, knowing, and intelligent. *State v. Ruppert*, 54 Ohio St.2d 263, 271, 375 N.E.2d 1250 (1978). Waiver may not be presumed from a silent record. *State v. Foust,* 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 52. However, if the record shows a jury waiver, the verdict will not be set aside except on a plain showing that the waiver was not freely and intelligently made. *Id.; Adams v. United States ex rel. McCann*, 317 U.S. 269, 281, 63 S.Ct. 236, 87 L.Ed. 268 (1942). Moreover, a written waiver is presumptively voluntary, knowing, and intelligent. *Foust* at ¶ 52; *United States v. Sammons*, 918 F.2d 592, 597 (6th Cir.1990). *See also State v. Bays*, 87 Ohio St.3d 15, 19, 716 N.E.2d 1126 (1999).

**{¶ 46}** At a hearing on March 31, 2010, defense counsel stated that they had met with Osie ten days before and discussed his option of going forward with a jury trial or being tried to a three-judge panel. One of Osie's attorneys met with him on March 30 and discussed the same topic with him for 15 to 20 minutes. On March 31, defense counsel filed a written jury waiver signed by Osie.

**{¶ 47}** At the March 31 hearing, the trial court conducted a colloquy with Osie to ensure that his waiver was knowing, voluntary, and intelligent. In response to the judge's questions, Osie acknowledged that he understood that a

jury consisted of 12 people, that he would play an active role in picking the jurors, that the jury would weigh the evidence and decide the credibility of the witnesses, and that he could not be found guilty unless the jury unanimously agreed that the state had proven the charges beyond a reasonable doubt. Osie acknowledged that he understood that the jury would also decide whether he would receive a death sentence, that this decision would be based on whether the state proved beyond a reasonable doubt that the aggravation outweighed the mitigation, and that this decision must also be unanimous. Osie acknowledged understanding that by giving up a jury, he would be tried by a three-judge panel, whose verdicts would also have to be unanimous.

{¶ 48} Osie affirmed that no one had threatened him, coerced him, or promised him anything in exchange for his jury waiver. He acknowledged understanding that his right to a jury trial was protected by the state and federal Constitutions and by statute. He acknowledged that he had discussed "all of this" with his counsel, they had answered all his questions, and he had nothing more to ask them.

{¶ 49} After the colloquy, Osie signed a second jury waiver in open court. Before signing, Osie acknowledged that he had had an opportunity to go over it. The written waiver contains the following acknowledgement: "I fully understand that under the laws of this State, I have a Constitutional right to a trial by jury. I wish to give up my right to a trial by jury in this case." The waiver further states:

> I fully understand that I am not only waiving the right to have my guilt or innocence determined by a jury, but also waiving my right to have a jury decide the sentence to be imposed upon me in the event of a guilty verdict. I fully understand that in that event, upon completion of a sentencing hearing, the same three-judge panel, who determined my guilt as to the crime(s) charged

and the specification(s) thereto, would determine the sentence to be imposed upon me.

**{¶ 50}** The trial judge found that Osie had knowingly, voluntarily, and intelligently waived his jury-trial right.

Voluntariness

**{¶ 51}** Nothing in the record suggests that the jury waiver was involuntary. When the trial court accepted Osie's written waiver, Osie affirmed that his decision was voluntary and that he had discussed his decision with his counsel. The advice of counsel is a factor supporting a finding of voluntariness. *Bays*, 87 Ohio St.3d at 19, 710 N.E.2d 1126. We conclude that the record supports the trial court's finding that Osie's jury waiver was voluntary.

Knowing and Intelligent Waiver

**{¶ 52}** Because "[a] waiver is the intentional relinquishment of a known right or privilege * * *, a defendant must have some knowledge of the nature of the jury trial right to make a valid waiver." *Id.* at 19-20. However, "[t]here is no requirement for a trial court to interrogate a defendant in order to determine whether he or she is fully apprised of the right to a jury trial." *State v. Jells*, 53 Ohio St.3d 22, 559 N.E.2d 464 (1990), paragraph one of the syllabus. "The Criminal Rules and the Revised Code are satisfied by a written waiver, signed by the defendant, filed with the court, and made in open court, after arraignment and opportunity to consult with counsel." *Id.* at 26.

**{¶ 53}** Osie contends that the trial court failed to inquire into his "background, IQ, or level of education" to ensure that he understood the legal proceedings. However, he cites no authority to show that such an inquiry is a prerequisite for a valid waiver. "[A] defendant need not have a complete or technical understanding of the jury-trial right in order to waive it." *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 44, citing

*United States v. Martin*, 704 F.2d 267, 273 (6th Cir.1983). "A defendant is sufficiently informed to make an intelligent waiver if he was aware that a jury is composed of 12 members of the community, he may participate in the selection of the jurors, the verdict of the jury must be unanimous, and * * * a judge alone will decide guilt or innocence should he waive his jury trial right." *Martin* at 273; *see also Fitzpatrick*, *id*. The trial court advised Osie of all these things, and Osie acknowledged that he understood them.[4] In our view, the record supports the trial court's finding that Osie's waiver was knowing and intelligent.

{¶ 54} Osie contends that the trial court should have inquired into his mental health before accepting his waiver, based on the court's knowledge of certain letters that the state had seized from Osie's cell. Osie contends that these letters "would have led anyone to have concerns about Osie's mental health," because they showed that his "thought process was strange and erratic."

{¶ 55} The letters in question are directed to Robin Patterson. In tones of suspicion and anger, they make numerous complaints about Patterson's failure to contact Osie; accusations that Patterson was a heavy drug user and sexually unfaithful; accusations that Patterson had Williams killed and had framed Osie for the murder; and threats against Patterson, both veiled and explicit. They also contain declarations of love, explicit reflections on his sexual relationship with Patterson, and Osie's apologies for having assaulted Patterson in the past.

{¶ 56} Osie's characterization of these letters as evincing mental illness is conclusory and speculative. Osie does not explain how the letters would tend to raise questions about his mental health. Moreover, as the state points out, there is nothing in the record to suggest that Osie had any mental-health issues. Defense counsel never raised Osie's competence as an issue. "If counsel had some reason

---

[4] "The statement that this knowledge is *sufficient* is not, of course, equivalent to a statement that it is constitutionally required." (Emphasis sic.) *United States v. Sammons*, 918 F.2d 592, 597 (6th Cir.1990).

to question defendant's competency, they surely would have done so." *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 39 (holding that trial court did not err by failing to make sua sponte finding that defendant was incompetent to stand trial).

{¶ 57} We overrule Osie's tenth proposition of law.

B. Judge's Failure to Recuse

{¶ 58} In his 17th proposition of law, Osie contends that Judge Noah E. Powers II, who presided over the trial, should have recused himself because his pecuniary relationship with the defense mitigation specialist, who was the judge's former law partner, created an appearance of impropriety.

{¶ 59} Some months before trial, the defense requested that attorney Christopher J. Pagan be appointed as the defense mitigation specialist. Judge Powers informed the parties on the record that he had an ongoing financial relationship with Pagan, because they had been law partners, and Pagan "still owes me [the judge] money." Judge Powers was initially reluctant to appoint Pagan for this reason. However, recognizing that defense counsel had valid reasons for desiring the appointment, Judge Powers recused himself from ruling on the defense motion to appoint Pagan. The matter was referred to Judge Michael J. Sage, the administrative judge of the common pleas court.

{¶ 60} Judge Sage held a hearing on the motion to appoint Pagan. At the hearing, defense counsel explained that Judge Powers had recused himself from the motion because "there are still some cases that Mr. Pagan has in his office that Judge Powers was working on at the time, and he is still owed money from those cases if and when they settle or if judgment is obtained."

{¶ 61} The prosecution expressed concerns because, if Osie waived his right to a jury trial and if Pagan was called to testify in the penalty phase, Judge Powers might be compelled to recuse himself. Defense counsel responded that

the defense did not anticipate waiving a jury and in any event did not plan to call Pagan as a witness. Judge Sage granted the motion to appoint Pagan.

{¶ 62} Osie never asked that Judge Powers recuse himself, nor did he raise the issue of Judge Powers's alleged bias before the chief justice pursuant to R.C. 2701.03, which establishes procedures for filing an affidavit of disqualification against a common pleas judge. Ohio Constitution, Article IV, Section 5(C) provides: "The chief justice of the supreme court or any judge of that court designated by him shall pass upon the disqualification of any judge of the courts of appeals or courts of common pleas or division thereof." This provision vests exclusive authority to pass on disqualification matters in the chief justice or her designee. *See Beer v. Griffith*, 54 Ohio St.2d 440, 441-442, 377 N.E.2d 775 (1978).

{¶ 63} In *Beer*, the court of appeals voided a trial court's judgment on the ground that the trial judge in that case should have recused himself. We reversed, holding: "Since only the Chief Justice or his designee may hear disqualification matters, the Court of Appeals was without authority to pass upon disqualification or to void the judgment of the trial court upon that basis." (Footnote omitted.) *Id.* at 441.

{¶ 64} Similarly, in *State v. Moore*, 93 Ohio St.3d 649, 650, 758 N.E.2d 1130 (2001), we held that an appellant who had failed to file an affidavit of disqualification could not complain on appeal that the judges on the court below were biased. *Moore* was an appeal to this court from the judgment of a court of appeals that denied an application to reopen an appeal under App.R. 26(B). The appellant argued in this court that the judges of the court of appeals should have recused themselves from ruling on his application. Citing *Beer* and Article IV, Section 5(C), we held: "Under R.C. 2501.13, when a party believes that a judge of the court of appeals is biased, the proper avenue for redress is filing an affidavit of

disqualification with this court. * * * Moore did not file such an affidavit, and therefore is foreclosed from bringing such a complaint." *Id.* at 650.

{¶ 65} Osie should have brought his bias claim before the chief justice via affidavit for disqualification under R.C. 2701.03. Having failed to do so, he is likewise "foreclosed from bringing such a complaint," *id.*, on appeal of his conviction.[5]

{¶ 66} In addition to being waived, Osie's claim lacks merit. The alleged conflict is based on Osie's belief that Judge Powers "ha[d] a pecuniary interest in not damaging his former law partner's reputation." Osie appears to be arguing that if Pagan was appointed and his performance damaged his reputation, the result might be a reduction in the income of his law firm that could endanger his ability to meet his financial obligations to Judge Powers. Because Judge Powers might suffer "financial loss if Pagan's reputation was harmed," he was "invested in Pagan's long term success."

{¶ 67} Osie's argument is speculative. Osie does not explain how Pagan's reputation stood to be harmed by participating in this case. Nor does he explain how an interest in protecting Pagan's reputation would give rise to a bias against the defense, given that Pagan was affiliated with the defense.

{¶ 68} Osie cites *Tumey v. Ohio*, 273 U.S. 510, 523, 47 S.Ct. 437, 71 L.Ed. 749 (1927), but *Tumey* is in no way apposite here. *Tumey* holds that a criminal defendant is denied due process when subjected to trial before a judge with "a direct, personal, substantial pecuniary interest in reaching a conclusion against him." In *Tumey*, the mayor presiding over the village mayor's court stood

---

[5] In *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97, we recently overturned an aggravated-murder conviction on appeal, partly on the ground of judicial bias against defense counsel. *Dean* is distinguishable, however. In *Dean*, the bias claim was "inextricably entwined" with the defendant's claim that the trial court had improperly denied his request to represent himself. *Dean* at ¶ 48. Thus, we could not fully consider the latter claim without considering the bias claim. *See id.* at ¶ 66-75. Here, Osie's allegation of bias is not "entwined" with his other claims.

to receive $12 in "costs" if—and only if—the defendant was convicted. But in this case, Judge Powers's relationship with Pagan gave him no "direct, personal, substantial pecuniary interest," *Tumey*, either in convicting Osie or in subjecting him to the death penalty.

{¶ 69} Finally, Osie argues that "[a]greeing not to call Pagan before a mitigation investigation had been undertaken violated Osie's right to effective assistance of counsel." However, Osie fails to outline any reasoning by which we could reach such a conclusion.

{¶ 70} To demonstrate ineffective assistance, Osie would have to show both that trial counsel's failure to call Pagan as a witness was deficient performance and that it prejudiced him. *See generally Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He does not attempt to make either showing here. Defense counsel may have had valid strategic reasons for not wanting Judge Powers to recuse himself. Moreover, the defense could present whatever witnesses and evidence Pagan's investigation might uncover without having to call Pagan to testify. Osie identifies nothing in the record to show why the defense needed Pagan to testify or how he might have testified. Consequently, Osie fails to demonstrate either deficient performance or prejudice.

{¶ 71} Osie's 17th proposition of law is overruled.

C. Selection of Three-Judge Panel

{¶ 72} In his ninth proposition of law, Osie contends that the three-judge panel was selected by the judge presiding over the case, Judge Powers, rather than by the presiding judge of the common pleas court, Judge Sage, who should have chosen the panel under R.C. 2945.06. Accordingly, he claims, the panel lacked jurisdiction over his case, and he is entitled to a new trial.

{¶ 73} On April 17, 2009, Judge Powers presided over a hearing at which two other judges for a proposed three-judge panel were selected, in case the defendant elected to waive a jury. Each of the other six judges of the Butler

18

County Common Pleas Court was assigned a number based on seniority. Six balls, numbered 1 through 6, were placed in a bottle. A member of the court's staff pulled the balls randomly from the bottle.

{¶ 74} Before this was done, Judge Powers stated: "[A]s each number is drawn sequentially, those will be the judges that are assigned to the case should the defense decide to waive a jury in this matter and proceed to a three-judge panel. Does anybody have an objection to that procedure?" Defense counsel said: "No, Your Honor." Judges Patricia Oney and Charles Pater were the first two judges whose numbers were pulled from the bottle.

{¶ 75} Nearly a year later, Osie decided to waive his right to a jury trial. He submitted a written, signed jury waiver on March 31, 2010. The trial court held a hearing that day, during which Judge Powers conducted a jury-waiver colloquy with Osie, and Osie signed another written waiver, this time in open court. Both jury waivers were filed.

{¶ 76} Also on March 31, the trial court filed the following judgment entry:

> The Court, having accepted the Defendant's *Waiver of a Trial by Jury* * * * and * * * having previously determined, by random draw, that JUDGE PATRICIA S. ONEY and JUDGE CHARLES PATER shall be assigned to sit as part of a three-judge [panel] * * * in the event that Defendant entered an appropriate waiver of trial by jury, it is
>
> ORDERED that a three-judge panel shall be empanelled, * * * to consist of JUDGE NOAH E. POWERS II, presiding, with JUDGES PATRICIA S. ONEY and CHARLES PATER acting as the balance of the three-judge panel * * *.

(Italics and capitalization sic.) This entry was signed by both Judge Powers, in his capacity as "Assigned Trial Judge," and Judge Sage, in his capacity as "Current Presiding and Administrative Judge" of the Butler County Court of Common Pleas.

{¶ 77} Osie contends that this selection procedure violated R.C. 2945.06, which governs the selection of three-judge panels in bench-tried capital cases, because Judge Powers was not the presiding judge of the common pleas court and was therefore not authorized by R.C. 2945.06 to choose the other members of the three-judge panel. Osie further contends that because Judge Powers lacked authority to choose the panel, the panel lacked jurisdiction to try this capital case.

{¶ 78} R.C. 2945.06 provides:

> If the accused is charged with an offense punishable with death, he shall be tried by a court to be composed of three judges, consisting of the judge presiding at the time in the trial of criminal cases and two other judges to be designated by the presiding judge or chief justice of that court * * *.

{¶ 79} We have recently had occasion to construe R.C. 2945.06. *See State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557. In *Wesson*, we held: "The term 'presiding judge,' as used in R.C. 2945.06, does not refer to the judge to whom a capital case has been assigned, but rather refers to the presiding judge of the common pleas court." *Wesson* at ¶ 46.

{¶ 80} We begin by observing that at trial, Osie never objected to either the panel members or to the procedures used in selecting the panel. Furthermore, in *Wesson* we expressly declined to hold that "error in the selection of the three-judge panel is per se reversible error [or] that such an error could not be waived." *Id.* at ¶ 50. In *Wesson*, the defense "never objected to the procedure followed by

[the judge] to select the panel member nor objected to the panel members" and thereby "forfeited all but plain error." *Id*. at ¶ 51. Like Wesson, Osie failed to object at trial and therefore has forfeited all but plain error.

{¶ 81} There are three prerequisites to a finding of plain error: "First, there must be an error, *i.e*., a deviation from a legal rule. * * * Second, the error must be plain. * * * Third, the error must have affected 'substantial rights.' We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

{¶ 82} In this case, Osie fails to demonstrate the first, and most fundamental, of these prerequisites: the existence of an error. No error inhered in the selection of the panel. The legal rule established by R.C. 2945.06 is that the presiding judge of the common pleas court has the power to appoint the panel members. *Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, syllabus. And there was no deviation from that rule in this case, because Judge Powers did not appoint the panel. Judge Sage did, by signing the March 31 entry.

{¶ 83} "A court of record speaks only though its journal and not by oral pronouncement or mere written minute or memorandum." *Schenley v. Kauth*, 160 Ohio St. 109, 113 N.E.2d 625 (1953), paragraph one of the syllabus. Therefore, the March 31, 2010 journal entry—not the session of the trial court at which the names of the panel members were drawn—constituted the actual appointment of the panel. Because Judge Sage signed that entry, it was Judge Sage who appointed the panel.

{¶ 84} Therefore, we reject Osie's argument that although Judge Sage signed the March 31 entry appointing the panel, "he took no part in the actual designation of the other two judges." The March 31 entry *was* the "actual designation of the other two judges." The fact that Judge Powers presided over

21

the hearing at which the panel members were drawn does not matter, just as it does not matter that a court employee actually drew the names from the bottle.

{¶ 85} Additionally, "[r]eversal for plain error 'is warranted only if the outcome of the trial clearly would have been different absent the error.' " *Wesson* at ¶ 52, quoting *State v. Hill*, 92 Ohio St.3d 191, 203, 749 N.E.2d 274 (2001). As *Wesson* demonstrates, the claimed error was not outcome-determinative in this case.

{¶ 86} In *Wesson*, even though the wrong judge (the judge presiding over the *trial*, rather than the presiding judge of the *court*) appointed the panel members, we declined to find plain error because the defendant did not contend that "the appointment of different members to the three-judge panel would have changed the outcome of the proceeding. Further, both of the panelists served as members of the Summit County Court of Common Pleas. Nothing suggests that either was ineligible or unqualified to hear the case." *Wesson,* 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, at ¶ 52.

{¶ 87} Here, as in *Wesson*, Osie does not contend that the appointment of different members to the panel would have changed the outcome in his case. Moreover, as in *Wesson*, both panelists were judges of the appropriate common pleas court, and nothing in the record suggests that either judge was ineligible or unqualified to hear the case.

{¶ 88} For the foregoing reasons, the procedure whereby Judges Oney and Pater were appointed to the panel was not plain error. Osie's failure to make a contemporaneous objection to that procedure forfeits his claim. Hence, we overrule Osie's ninth proposition of law.

## II. Confession Issues

### A. Voluntariness of Confession

{¶ 89} Osie's 15th and 16th propositions of law challenge the voluntariness of his confession and will be considered together.

Osie's Confession

{¶ 90} When Osie arrived at the sheriff's office on the night of his arrest, he was given a soft drink and taken to the interview room, where his handcuffs were removed. Detective Rob Whitlock read him his *Miranda* rights from a card. Whitlock testified at the suppression hearing that he told Osie to sign the card "if he understood his rights and he wanted to go ahead and talk to us." Osie signed.

{¶ 91} The detectives then talked to Osie for about 15 minutes, without recording the conversation. During this part of the interrogation, Osie claimed that Williams had "come at him" with a knife and that Osie "had taken the knife and turned it on Mr. Williams * * * to stab him twice."

{¶ 92} Then they turned on the tape recorder, and Detectives Whitlock and Melissa Gearhart interviewed Osie from 7:58 p.m. to 8:43 p.m. Osie changed his story several times during this interview, but ultimately confessed to cutting Williams's throat, stabbing him, and stealing from him. After the first taped interview concluded, Osie was given a fast-food meal. At 9:07 p.m., Detective Gearhart turned on the tape recorder and began a second interview with Osie, during which she asked him about the whereabouts of the knife and about the goods stolen from the house. This interview lasted ten minutes.

Alleged Coercion

{¶ 93} "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances * * *." *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, *vacated on other grounds,* 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978). Nevertheless, "the use of an inherently coercive tactic by police is a prerequisite to a finding of involuntariness." *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 71, citing *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Consequently, unless the detectives used a coercive tactic, we need not assess the totality of the

circumstances. *State v. Treesh*, 90 Ohio St.3d 460, 472, 739 N.E.2d 749 (2001); *Perez* at ¶ 71. "Evidence of use by the interrogators of an inherently coercive tactic (*e.g.*, physical abuse, threats, deprivation of food, medical treatment, or sleep) will trigger the totality of the circumstances analysis." *State v. Clark*, 38 Ohio St.3d 252, 261, 527 N.E.2d 844 (1988).

{¶ 94} In his 16th proposition of law, Osie claims that the detectives used a coercive tactic when they urged Osie to tell the truth so as to keep Patterson clear of the investigation. Osie contends that this alone rendered his confession involuntary.

{¶ 95} During the first taped interview, Detective Gearhart asked Osie: "And who is the one person that you sent the text to, after everything was done?" Osie replied, "Robin." Gearhart and Osie then had this exchange:

Q  Okay. So * * * here is what you don't realize that you're not doing right now by not giving us the big picture, do you love Robin?

A  Yeah.

Q  Love her a lot?

A  Yeah.

Q  Okay. The one person that you've sent a text to, after this has happened, which is last night, is Robin, she is the only other person besides you that knows that something has happened to David. Where is that going to take us? * * *

A  To me.

Q  Where is that going to take us? No, think about it. * * * You've sent your girlfriend who you love to death a text.

* * *

* * * You're not going to have to worry about David anymore, but you're going to sit here * * * and tell us I did all of this stuff, I've punched him, I've stabbed him, I've slit his throat, * * * one other person knows that something's happened to David, maybe not what, I don't know what your words were earlier, but misconstrued or whatever, you sent her a text that said, you don't have to worry about David anymore?

A  Uh-huh.

Q  Who does that take us to, because you don't want to fill in the blanks?

A.  Her.

Q.  Bingo.  Is that what you want to leave us with, you love her?

A  Uh-huh.

Q  You need to think about that.  Because I guarantee her fingerprints are in the house, she had been there?

A  Yeah.

Q  They had a business together.

A  Yeah.

Q  What is that going to do for her, what are you doing for her right now by not completing your story, this is your story * * * but that's what you're doing to her, * * * you need to think about that.  This is what you're doing to her.

* * * Don't turn around and try and do it this way, though, because that's where it's going to take us.  And I don't think you want to do that.

* * *

But getting the stuff back is going to help you * * *. It's a big deal for you, and it's not a big deal for Robin. Where is the TV?

**{¶ 96}** Threats against a suspect's family can be coercive. *See generally Lynumn v. Illinois*, 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963) (police threatened that suspect's children would be taken from her if she refused to cooperate); *Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961) (confession followed police chief's pretense of placing a call ordering suspect's wife brought in for questioning).

**{¶ 97}** In particular, "threats to arrest members of a suspect's family may cause a confession to be involuntary." *United States v. Finch*, 998 F.2d 349, 356 (6th Cir.1993). The issue "turns on * * * whether the threat could have been lawfully executed," i.e., whether the police had probable cause to arrest the person in question. *United States v. Johnson*, 351 F.3d 254, 263 (6th Cir.2003). When there is no probable cause for the threatened arrest and therefore no legal basis for carrying out the threat, a confession caused by the threat is involuntary. *Id.* at 262.

**{¶ 98}** In *Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, we held that police had not coerced the defendant when they indicated to him that his wife could be subject to arrest, because the police indeed had probable cause to arrest the defendant's wife. *Id.* at ¶ 72-76. "Indeed, it may more generally be said that a mere threat to take action which would be lawful and necessary absent cooperation is not objectionable." 2 LaFave, Israel, King & Kerr, *Criminal Procedure,* Section 6.2(c), at 623 (3d Ed.2013), fn. 96.

**{¶ 99}** The alleged threats to involve Patterson in the investigation are, if anything, less coercive than the circumstances in *Perez*: Patterson was not Osie's wife, and "[a] relationship other than a spousal relationship is not as susceptible to

26

coercion by threat or promise." *Johnson v. State*, 513 N.E.2d 650, 652 (Ind.1987).

{¶ 100} Moreover, the detectives never threatened to arrest Patterson. Detective Gearhart did suggest that Osie's failure to come clean might implicate Patterson as a suspect ("Who does that take us to, because you don't want to fill in the blanks?"). But "vague and indefinite" statements do not render a confession involuntary. *Id.* at 653. Moreover, "the police may bring to the defendant's attention the probability that his relative may be culpable." *Commonwealth v. Raymond*, 424 Mass. 382, 396, 676 N.E.2d 824 (1997).

{¶ 101} In *United States v. Jones*, 32 F.3d 1512 (11th Cir.1994), an officer told the defendant that his girlfriend would continue to be a suspect unless he explained her participation and that if his girlfriend was part of the robbery, she was subject to prosecution. No promise was made that his girlfriend would not be prosecuted if he cooperated. The court concluded: "Not only was this information true, but also such comments or information would not render Jones's subsequent statements involuntary." *Id.* at 1517. *See also United States v. Haynes*, 301 F.3d 669, 684 (6th Cir.2002) (alleged threats to take legal action against defendant's girlfriend and daughter "were not of such a gravity that an ordinary person * * * would have lost the will to resist"); *State v. Edwards*, 116 S.W.3d 511, 530-531 (Mo.2003) (police had interviewed defendant's wife and children and told him that they would do so again if he did not tell the truth; held, not coercive).

{¶ 102} We conclude that Detective Gearhart's discussion of Patterson's potential involvement during the interrogation was not coercive.

### Intoxication

{¶ 103} In his 15th proposition of law, Osie contends that intoxication and cocaine use rendered him incapable of voluntarily waiving his right to remain silent. Sometime after Detective Whitlock Mirandized Osie, Osie told him that he had "some beers" that day, and on the previous night (February 13), he and Robin

Patterson had been "doing lines of cocaine." However, Whitlock testified that Osie did not smell of alcohol and did not appear to be intoxicated.

{¶ 104} There was no evidence at the suppression hearing indicating that Osie had used cocaine more recently than the night before the interrogation. Moreover, the defense submitted no evidence to show how long the effects of cocaine might be expected to continue. Therefore, there was nothing to refute Whitlock's testimony that Osie did not appear intoxicated.

{¶ 105} Moreover, the record shows that the confession was voluntary under the totality of the circumstances. The totality of the circumstances includes "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051, paragraph two of the syllabus.

{¶ 106} There is no evidence that Osie was mistreated in any way. He was given food and drink and during both interviews was permitted to smoke "as he wished." There is no evidence that he was threatened or promised anything. Osie was interrogated for approximately an hour; then he had a 24-minute break, followed by ten more minutes of interrogation. The record shows that Osie was around 47 years old at the time of the interrogation. Osie never complained of being tired or sleepy, having a cloudy or distorted memory, or being under the influence of any mind-altering substance. Detective Whitlock testified that he appeared to be nervous, but not confused.

{¶ 107} Under the totality of the circumstances, we conclude that Osie voluntarily waived his rights and that his confession was voluntary. Accordingly, Osie's 15th and 16th propositions of law are overruled.

B. Partial Recording of Interrogation

{¶ 108} In his 18th proposition of law, Osie contends that the trial court should have suppressed his confession because the detectives who obtained it recorded only part of the interrogation.

{¶ 109} Nothing in the federal or Ohio Constitution requires that confessions or police interviews be recorded. *State v. Smith*, 80 Ohio St.3d 89, 106, 684 N.E.2d 668 (1997). But Osie contends that if police do record an interview with a suspect, due process and fundamental fairness require them to record the whole interview, not just a portion of it. He contends that if police fail to record the whole interview, the trial court must exclude the recorded portion from evidence.

{¶ 110} Osie did not, at trial, raise the partial recording of the interview as a ground for excluding the recorded portions. Therefore, he has waived this issue unless he can demonstrate plain error.

{¶ 111} Osie's claim is a novel one at best. He cites no cases holding that partial recording of a custodial interview is grounds for excluding the recorded portion. The cases he does cite do not stand for any such proposition.[6] *See United States v. Shaver*, 89 Fed.Appx. 529, 532-533 (6th Cir.2004) (neither Fed.R.Evid. 106 nor common-law "doctrine of completeness" entitled defendant to introduce his own self-serving hearsay statements at trial); *United States v. Spearman*, 186 F.3d 743, 756 (6th Cir.1999) (trial court did not err in allowing the government to play only portions of an incriminating videotape; defense had been given the opportunity to play the entire videotape); *State v. Davis*, 4 Ohio App.3d 199, 447 N.E.2d 139 (1982) (under Evid.R. 106, a party may be compelled to

---

[6] One state supreme court has used its supervisory authority to adopt a rule that any recording of an interrogation is admissible only if it is complete. *State v. Barnett*, 147 N.H. 334, 337-338, 789 A.2d 629 (2001). Another state supreme court has held that the Due Process Clause of that state's Constitution requires police to record all custodial interrogations conducted in a place of detention in their entirety when feasible. *Stephan v. State*, 711 P.2d 1156, 1158 (Alaska 1985).

choose between admitting an entire tape-recorded statement and forgoing use of the statement altogether).

{¶ 112} None of these cases holds, implies, or even suggests, that where a conversation was partly recorded and partly unrecorded, the trial court must exclude the recorded portion. Nor are these cases based on constitutional principles. (Although *Davis* does speak of "the fundamental fairness of presenting statements in context," *id.* at 201, its holding is ultimately based on Evid.R. 106.) An error is plain error only if the error is obvious. *E.g.*, *State v. Hancock,* 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 60. Moreover, plain error must be plain "at the time that the trial court committed it." *State v. Barnes*, 94 Ohio St.3d at 28, 759 N.E.2d 1240. In view of the lack of authority to support Osie's argument, we cannot find that the trial court committed plain error by not suppressing his confession sua sponte on the ground that only part of the interrogation was recorded. Hence, we overrule his 18th proposition of law.

III. Hearsay/Confrontation Issue

{¶ 113} In his second proposition of law, Osie contends that hearsay statements by the victim, David Williams, were introduced at trial and used as substantive evidence of Osie's guilt, in violation of Osie's Sixth Amendment right to confront the witnesses against him.

{¶ 114} Osie does not specifically identify the particular statements alleged to have been improperly admitted. However, according to his brief, the statements at issue were "admitted * * * through the testimony of Nick Wiskur."

{¶ 115} Wiskur's testimony described statements he overheard Williams make during Williams's February 13, 2009 phone conversation with Osie. Wiskur testified that Williams said: "I just want to make this right. Robin won't return any of my phone calls. I don't really have an issue with it." Wiskur further testified that Williams said: "I'm going to go to the police. I'm going to file charges. This needs to be taken care of."

**{¶ 116}** These statements were admitted over defense objection. The state did not contest the defense claim that the statements were hearsay, but argued that they were admissible under two hearsay exceptions: excited utterance and forfeiture by wrongdoing, Evid.R. 804(B)(6). The trial court overruled the defense objection and admitted Wiskur's testimony about Williams's statements under the forfeiture-by-wrongdoing exception of Evid.R. 804(B)(6).

**{¶ 117}** In their briefs, both parties extensively analyze the admissibility of Williams's statements under Evid.R. 804(B)(6) and under the forfeiture-by-wrongdoing exception to the Confrontation Clause of the Sixth Amendment. *See generally Giles v. California*, 554 U.S. 353, 128 S.Ct. 2678, 171 N.E.2d 488 (2008) (discussing common-law doctrine of forfeiture by wrongdoing). However, we conclude that Williams's statements were admissible for a more fundamental reason: they were not *hearsay*, as Evid.R. 801(C) defines that term, because they were not introduced for the purpose of proving the truth of the matters asserted therein.

**{¶ 118}** " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). A statement is not hearsay when offered for a purpose other than to prove the truth of the matter asserted. *State v. Davis*, 62 Ohio St.3d 326, 343, 581 N.E.2d 1362 (1991). In this case, the state did not use Williams's statement to establish the truth of the matter asserted, but for the nonhearsay purpose of establishing Osie's motive in killing Williams.

**{¶ 119}** In his conversation with Osie, Williams said: "I'm going to go to the police. I'm going to file charges." The "matter asserted" in Williams's out-of-court statement was that he intended to report something (the thefts from UCU) to the authorities and to file charges concerning the matter.

**{¶ 120}** The state did not introduce Williams's statement for the purpose of showing that Williams *actually intended* to file charges. In fact, whether

Williams so intended does not affect Osie's guilt or innocence of aggravated murder. Therefore, the relevance of Williams's statement to Osie did not hinge upon whether it was true.

{¶ 121} Instead, the statement was relevant because Williams made it *to Osie*. Specification 3 to the aggravated-murder counts charged Osie with murdering "a witness to an offense who was purposely killed to prevent the victim's testimony in any criminal proceeding." R.C. 2929.04(A)(8). To prove this specification, the state had to prove that Osie killed Williams for the purpose of preventing him from filing a criminal charge. The fact that Williams told Osie that he intended to go to the police to file charges was relevant to prove Osie's purpose in killing Williams, and consequently, to prove the (A)(8) specification.

{¶ 122} "It is well established that extrajudicial statements made by an out-of-court declarant are properly admissible to explain the actions of a witness to whom the statement was directed." *State v. Thomas*, 61 Ohio St.2d 223, 232, 400 N.E.2d 401 (1980). A statement is not hearsay when introduced to show its effect on the listener. "A statement that D made a statement to X is not subject to attack as hearsay when its purpose is to establish the state of mind thereby induced in X, such as * * * having knowledge or motive * * *." (Footnotes omitted.) 2 *McCormick on Evidence*, Section 249, at 191 (7th Ed.Broun Ed.2013).

{¶ 123} That is precisely how the state used Williams's statement to Osie: to show that Osie believed that Williams intended to file charges. In closing argument, the prosecutor said:

> And so what happens later is a phone call to Dave [Williams], and so *we knew that Osie knows* that the information was turned over to Dave, because then the conversation between Dave and Greg Osie on the phone where Dave specifically told

him, "I am going to the police. I am going to file charges. I am going to the police."

> That was the last conversation that we know they had for a fact when the phone hung up.

(Emphasis added.)

{¶ 124} The state reiterated this point in its rebuttal argument. The prosecutor argued that Osie's purpose in killing Williams "was to keep him from presenting that criminal testimony." In support of this assertion, the prosecutor again cited Wiskur's testimony about the Williams-Osie conversation:

> What does Osie do then [after talking to Wiskur]? He calls Dave that same day, and they had that very heated argument that Nick Wiskur overhears.
> And in that argument, Dave tells Osie, "I'm going to the police."

{¶ 125} The state used Williams's statement to Osie, as testified to by Wiskur, solely for the nonhearsay purpose of showing its effect on Osie—i.e., showing that Osie killed Williams because he believed that Williams intended to file charges with regard to the thefts. Because the statement was not introduced to prove the truth of the matter asserted therein, it was not "hearsay" as the Rules of Evidence define that term.

{¶ 126} For the same reason, the statement's admission did not violate the Confrontation Clause. "The Clause * * * does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford v. Washington*, 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177

(2004), fn. 9, citing *Tennessee v. Street*, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985). Accordingly, we overrule Osie's second proposition of law.

IV. Seizure of "Attorney Work Product"

{¶ 127} In his seventh proposition of law, Osie claims that the state violated his Sixth Amendment rights by seizing confidential materials, which he describes as "attorney work product," during a search of his jail cell and that the trial court erred by admitting these materials into evidence.

{¶ 128} At a motion hearing before trial, defense counsel complained that Osie's cell in the Butler County jail had been searched and that certain documents had been seized. Defense counsel explained that they had asked Osie to write down information that might assist them in preparing his defense, such as "mitigation witnesses, fact witnesses, names, address[es], phone numbers, whatever." Counsel stated that they had received a phone call from Osie "saying they came in and searched his cell and took all of the items that he had been preparing for us." After the seizure, the state provided copies of the seized items to the defense in discovery.

{¶ 129} The trial court said: "If * * * you [defense counsel] want to bring it before the Court and have an evidentiary hearing, I'll be more than willing to entertain that if that's necessary." The court admonished the prosecution: "[T]hey've got a right to have their work product protected, and I'm not saying that what you did wasn't appropriate. I don't have the evidence in front of me to say whether it was or it wasn't. But I am saying that if it's brought before me, I'm going to scrutinize it." The court then ordered the prosecution to examine its file and make sure that everything removed from Osie's cell had been turned over to the defense.

{¶ 130} When the defense raised the issue of seized work product at a later hearing, the trial court told counsel, "[I]f you think the prosecution did something wrong, * * * something that's suppressible, unconstitutional, whatever,

file a motion and bring it to my attention, and I'll conduct an evidentiary hearing on it, and we can put witnesses on the stand and deal with it in that manner."

{¶ 131} "Implicit within the meaning of [the constitutional right to counsel] is the right of a criminal defendant to consult privately with his attorney." *State v. Milligan*, 40 Ohio St.3d 341, 342, 533 N.E.2d 724 (1988). The leading case concerning the Sixth Amendment consequences of government intrusions into attorney-client communications is *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977).

{¶ 132} In *Weatherford*, several persons were arrested for vandalizing a government building. One of them was an undercover law-enforcement agent. One of his fellow arrestees retained a lawyer and, still unaware of the agent's true function, invited the agent to join them in confidential conversations on two occasions before trial. The *Weatherford* court rejected the defendant's claim that the agent's presence during attorney-client conversations violated the Sixth Amendment under the circumstances of that case. However, the court noted,

> Had Weatherford [the agent] testified at Bursey's [the offender's] trial as to the conversation between Bursey and [his attorney]; had any of the State's evidence originated in these conversations; had these overheard conversations been used in any other way to the substantial detriment of Bursey; or even had the prosecution learned from Weatherford  * * * the details of the [attorney-client] conversations about trial preparations, Bursey would have a much stronger case.

*Id.* at 554. However, there was "no tainted evidence * * *, no communication of defense strategy to the prosecution, and no purposeful intrusion" into the attorney-

client relationship. *Id*. at 558. Accordingly, "there was no violation of the Sixth Amendment." *Id.*

{¶ 133} Although *Weatherford* involved the actual presence of a government informant during consultations between the defendant and his counsel, the same principles have been applied to a case in which a defendant's written communication to his counsel was seized from his jail cell and used to impeach his testimony at trial. *See Bishop v. Rose*, 701 F.2d 1150 (6th Cir.1983). In *Bishop,* however, the result was different. The court found that the defendant's right to counsel had been violated because the confidential document was, in that case, used at trial to the substantial detriment of the defendant.

{¶ 134} Osie argues that even though the defense never filed a motion to suppress the alleged work product, the trial court "should have rejected the admission of the material as the gatekeeper of the evidence." But Osie cites no relevant authority to support this contention.

{¶ 135} In this case, the trial court correctly noted that it had no evidence before it. The trial court recognized that the defense had "a right to have their work product protected" and made clear that if the defense filed a motion to suppress, the court would hold an evidentiary hearing. Osie's counsel had ample opportunity to request an evidentiary hearing into the defense claim that work product had been seized. Counsel declined to do so.

{¶ 136} Moreover, the defense never objected at trial to the admission of State's Exhibit 64. Nor did the defense object to any other item of evidence on the ground that its seizure by the state violated the Sixth Amendment or on any related ground. "By failing to file a motion to suppress illegally obtained evidence, a defendant waives any objection to its admission." *State v. Campbell*, 69 Ohio St.3d 38, 44, 630 N.E.2d 38 (1994).

{¶ 137} The record provides no basis for a finding of plain error. Osie contends that two items of confidential work product were seized and used against

him at trial, State's Exhibit 64 and a list of names, places, and phone numbers. But, as seen from the discussion below, the purported list is not in the record and was never introduced at trial. Osie does not show how the list was "used" against him or that such a list even existed. And as will also be seen in our discussion below, State's Exhibit 64, the 48-page letter, cannot credibly be claimed to be attorney work product or a confidential attorney-client communication.

**{¶ 138}** In discussing his seventh proposition of law, Osie never identifies what, specifically, the trial court should have suppressed. However, in his 14th proposition of law (in which he asserts prosecutorial misconduct), he does specifically identify State's Exhibit 64 as "attorney work product" that the state should not have introduced against him. The state claims that Exhibit 64 was not work product and that it was probative of Osie's intent to kill Williams to protect Patterson from criminal charges.

**{¶ 139}** State's Exhibit 64 was a 48-page letter, or series of letters, handwritten by Osie and apparently directed to Robin Patterson, but never mailed. In his reply brief, Osie contends that despite appearances, Exhibit 64 "was not a letter" because he never intended to mail it. Osie describes Exhibit 64 as "a journal that Osie was writing at the direction of his attorneys * * * with daily journal entries that he imagined himself writing to Robin Patterson about the night that David Williams was killed." Osie's brief explains that "[h]is attorneys encouraged him to write down his thoughts in journal form in lieu of writing [Patterson] letters, due to the possibility of her being called as a witness."

**{¶ 140}** Osie's description of Exhibit 64 is unsupported by anything in the record. The only portion of the record Osie cites to support his assertions is the first page of Exhibit 64. On that page, Osie wrote: "My lawyers told me I'm not to write to you. They think you are a witness * * *." But nothing in Exhibit 64, or anywhere else in the record, indicates that this document is the result of "[h]is attorneys encourag[ing] him to write down his thoughts in journal form." Nor

does anything in the record substantiate Osie's claim that he never intended to mail the letters.

{¶ 141} Nor does Exhibit 64 fit the description that defense counsel gave the trial court: "When we met with him initially, we said write down things for us you may think assists in our defense; mitigation witnesses, fact witnesses, names, address[es], phone numbers, whatever * * *." There is nothing in Exhibit 64 to suggest that it was written at the direction of Osie's attorneys or intended for them.[7] Instead, it is a rambling series of declarations, including expressions of love, accusations, pleas, threats, memories, and promises, all directed to Osie's girlfriend. In sum, Osie fails to show that State's Exhibit 64 was a confidential attorney-client communication or attorney work product.

{¶ 142} Osie also contends that the state seized "a list of names, places, and phone numbers" created by Osie at the direction of his counsel and "designed to aid in the investigation and preparation of Osie's defense and mitigation presentation." Osie accuses the state not only of confiscating this list but of using it against him at trial.

{¶ 143} Osie does not, however, explain how the state used the list. Initially, we note that no such list was introduced into evidence at trial; consequently, Osie's claim that the trial court erred by admitting confidential attorney work product into evidence could not apply to the list.

{¶ 144} "Even where there is an intentional intrusion by the government into the attorney-client relationship, prejudice to the defendant must be shown before any remedy is granted." *United States v. Steele*, 727 F.2d 580, 586 (6th Cir.1984), citing *United States v. Morrison*, 449 U.S. 361, 365-366, 101 S.Ct.

---

[7] The exhibit does contain some factual allegations about the case, but it principally consists of complaints about Patterson's refusal to contact Osie; accusations that Patterson was a drug user, sexually unfaithful to Osie, and promiscuous; reminiscences about their sex life; declarations of love; apologies for having assaulted Patterson; and threats against Patterson, both veiled and explicit.

665, 66 L.Ed.2d 564 (1981). To determine prejudice, a court must look to the factors identified in *Weatherford*: "(1) whether the government deliberately intruded in order to obtain confidential and privileged information, (2) whether the government obtained directly or indirectly any evidence which was or could be used at trial as a result of the intrusion, (3) whether any information obtained was or could be used in any manner detrimental to the defendant, and (4) whether details about trial preparation were learned by the government." *Milligan*, 40 Ohio St.3d at 344, 533 N.E.2d 724.

{¶ 145} In this case, there was no showing of any of the above four factors. The record contains no evidence that the search of Osie's cell was a "deliberate intru[sion] in order to obtain confidential and privileged information." *Id.* As already noted, Osie's list of names, places, and phone numbers was not introduced at trial. Nor did the state use it to impeach any witness. *Compare Bishop v. Rose*, 701 F.2d at 1156-1157 (prosecution used defendant's 14-page handwritten document, intended for his attorneys, on cross-examination of defendant). There was no showing that possession of the list enabled the state to obtain any evidence that "was or could be used at trial." *Milligan* at 344. Nor was there any showing that the information obtained could be used to Osie's detriment in any way or that the prosecution learned any details about trial preparation from the list. Accordingly, the defense did not demonstrate that they were entitled to any remedy with regard to Osie's list of names, places, and phone numbers.

{¶ 146} Osie's seventh proposition of law was waived at trial, and Osie fails to show plain error. Accordingly, this proposition of law is overruled.

V. Prosecutorial Misconduct

A. *Brady* Claim—Delayed Disclosure of Evidence

{¶ 147} In his eighth proposition of law, Osie contends that the state's delayed disclosure of evidence favorable to him violated his right to a fair trial. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

{¶ 148} Osie contends that two items were subjected to delayed disclosure. First there was a laboratory report by a fingerprint analyst for the Ohio Bureau of Criminal Investigation and Identification ("BCI"). The report involved a box that contained a knife that, according to the prosecutor, may or may not have been the murder weapon. The report was dated April 13, 2009, nearly a year before the prosecution learned of its existence and disclosed it to the defense.

{¶ 149} The report stated that, on February 27, 2009 (13 days after the murder), Detective Monroe submitted a "[w]hite box containing [a] knife." The BCI analyst examined the box for fingerprints and found no latent prints with sufficient ridge detail for comparison.

{¶ 150} This report was disclosed to the defense on April 8, 2010. According to the prosecutor, this was the same day the prosecution itself learned of the report's existence. The prosecutor's letter of April 8, 2010, to lead defense counsel stated: "[W]e do not intend to use this report because nothing was revealed *and* the Defendant admitted that he took the murder weapon and threw it in the river. However, if you wish to admit the report, we will not object and stipulate to its admission." (Emphasis sic.) Neither the box nor the lab report was introduced into evidence by either party.

{¶ 151} Second, the felony record of state's witness Donald Simpson, Osie's cellmate to whom he had made damaging admissions, was not disclosed to

the defense until the same morning that Simpson testified.[8]  Simpson had three felony convictions: vehicular assault, attempted sexual battery, and sexual battery.

{¶ 152} Before cross-examining Simpson, defense counsel complained about the late disclosure, stating that had Simpson's record been disclosed earlier, they "certainly would have given the name or * * * information to the private investigator to investigate any further, but at this point, I mean he's here, he's testified. * * * [W]e believe the information they've given us up to now, so we'll use that and move forward."

{¶ 153} *Brady* holds that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87, 83 S.Ct. 1194, 10 L.Ed.2d 215.  Evidence is material if there is a " 'reasonable probability' " that the result of the trial would have been different had the evidence been disclosed to the defense.  *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).  "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898 (1988), paragraph five of the syllabus.

{¶ 154} *Brady* imposes on the government an obligation to turn over evidence that is both favorable to the defendant and material to guilt or punishment.  "Materiality pertains to the issue of guilt or innocence, and not to the defendant's ability to prepare for trial."  *United States v. Bencs*, 28 F.3d 555, 560 (6th Cir.1994), citing *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), fn. 20.

{¶ 155} "Thus, *Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose."  *Bencs* at

---

[8] Simpson was the state's second witness that day.

560. "Delay only violates *Brady* when the delay itself causes prejudice." *United States v. Patrick*, 965 F.2d 1390, 1400 (6th Cir.1992), *vacated and remanded on other grounds sub nom. Mohwish v. United States*, 507 U.S. 956, 113 S.Ct. 1378, 122 L.Ed.2d 754 (1993).

{¶ 156} Osie does not explain how he was prejudiced by the delayed disclosure. He argues that had his counsel "had earlier knowledge of this information [i.e., both the lab report and Simpson's record], they would have been available to develop a more thorough challenge of Simpson's allegations that he was collecting a knife that Osie had discarded." This claim is vague and speculative, however, and thus fails to reach the level of a reasonable probability, one that is "sufficient to undermine confidence in the outcome." *Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898, paragraph five of the syllabus.

{¶ 157} With regard to the BCI report on the box, Osie argues that even a "neutral" finding of no usable prints could be favorable to him. *See Patler v. Slayton*, 503 F.2d 472, 479 (4th Cir.1974). But the significance, if any, of the lack of prints on the box is unclear. The record does not disclose where the box was found or anything else about it that might tie it to the murder or explain why the lack of prints on it was exculpatory. Neither the box, the knife, nor the lab report was introduced in evidence by either side. Moreover, the killer's identity was not contested. Osie had long since confessed that he stabbed Williams. On these facts, Osie cannot show a reasonable probability that earlier disclosure of the lab report would have made a difference in the outcome of the trial.

{¶ 158} Simpson's felony record was clearly *Brady* material. However, the prosecutor did disclose it before Simpson testified, and he also elicited Simpson's felony convictions on direct examination. Again, Osie does not explain how earlier disclosure of Simpson's record would have enhanced the ability of the defense to impeach Simpson.

{¶ 159} Osie's eighth proposition of law is overruled.

### B. Other Misconduct Claims

{¶ 160} In his 14th proposition of law, Osie contends that prosecutorial misconduct denied him a fair trial. He divides his allegations into two categories: trial misconduct and penalty-phase misconduct.

### Trial Misconduct

{¶ 161} Osie's claims of trial misconduct duplicate other propositions of law in his brief. First, he claims that the prosecutors improperly withheld exculpatory evidence. Osie's eighth proposition raises the same issue.

{¶ 162} Second, Osie contends that the state relied on evidence obtained during an "improper search" of his cell. Although this sounds like a Fourth Amendment claim, his arguments actually duplicate his seventh proposition of law, in which he claims that the state violated his Sixth Amendment rights by obtaining and using "attorney work product."

{¶ 163} Because the claims raised in Osie's seventh and eighth propositions of law lack merit, we reject the claims raised in Part A of Osie's 14th proposition.

### Penalty-Phase Misconduct

{¶ 164} Osie's penalty-phase-misconduct claims focus on the prosecutor's arguments, but Osie did not object to any of the three statements that he now claims were improper. No plain error occurred here, because none of the prosecutor's statements were improper.

{¶ 165} First, Osie complains that the state made the following argument:

[T]here are aggravating circumstances that were proved, and now let's weigh that and think, an aggravated circumstance is something that goes beyond what we expect to see. It's beyond the norm. But what did we hear yesterday [during Osie's presentation of mitigating evidence] from questions, from answers about the

defendant? We heard his childhood, normal. It's great, normal. He was at one point married, normal. Two kids, normal. It's the human existence. We heard what's normal. That mitigation was in a word normal. It's the typical human experience is what we heard, but aggravated circumstances are anything but normal. Those are abnormal.

{¶ 166} The prosecutor also described Osie's mitigating evidence as "these feathers, these normal parts of human existence, * * * the normalcy of feathers," i.e., insubstantial when weighed against the grave aggravating circumstances.

{¶ 167} Osie contends that, by characterizing his mitigation as "normal," and, as such, deserving of little weight ("feathers"), the state's argument denied him the individualized consideration to which the Eighth Amendment entitles a capital defendant at sentencing. *See generally Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (individualized consideration is "a constitutionally indispensable part of inflicting the penalty of death").

{¶ 168} However, the state was entitled to argue that Osie's childhood had little weight in mitigation. "Prosecutors can urge the merits of their cause and legitimately argue that defense mitigation evidence is worthy of little or no weight." *State v. Wilson*, 74 Ohio St.3d 381, 399, 659 N.E.2d 292 (1996). Individualized consideration "means that we must focus on 'relevant facets of the character and record of the individual offender.' " *Enmund v. Florida*, 458 U.S. 782, 798, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), quoting *Woodson* at 304. Arguing about the merits of the specific evidence offered in mitigation by the defense does not deny individualized consideration of that evidence—quite the contrary.

**{¶ 169}** Osie further contends: "[T]he prosecutor argued that mitigation evidence regarding Osie before the time of the crime was not relevant to the sentencing determination." Osie is referring to the following passage from the prosecutor's argument:

> The final thing I think that we heard was that before 2006, Mr. Osie may have been a bit different, but we're here in 2010 evaluating whether those aggravated circumstances he committed in 2009 outweigh what's able to be put forward to you again here in 2010.

Osie contends that by making this argument, the prosecutor was "urging the court to ignore mitigation" and "circumvent[ing]" R.C. 2929.04(B), which requires the sentencer to consider the mitigating factors raised by the defendant.

**{¶ 170}** However, immediately after the statement at issue here, the prosecutor said:

> And I think that the way to look at this and a way to *put them on the scales* is they are like these feathers. Friends and family saying they love you, that I haven't really done too much before this, those are feathers. *They're not entitled to much weight*.

(Emphasis added.) The prosecutor was not urging the court to ignore the defense mitigation or arguing that it was irrelevant. Indeed, he acknowledged that it had its place "on the scales." He simply argued that it was "not entitled to much weight." Isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning. *Donnelly v. DeChristoforo*, 416 U.S. 637,

647, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *State v. Hill*, 75 Ohio St.3d 195, 204, 661 N.E.2d 1068 (1996).

**{¶ 171}** Finally, the prosecutor argued that the witness-murder specification, R.C. 2929.04(A)(8), was entitled to great weight, because "what that factor is saying is that a witness was silenced to subvert justice." The prosecutor then made the following statement, which Osie claims was improper: "This weight cannot be counterbalanced. There was nothing that was presented as evidence going to any mitigating factor that can counterbalance that, that silencing."

**{¶ 172}** This statement did not urge the court to "ignore mitigating factors," as Osie claims. Rather, it simply claimed that the (A)(8) factor had such weight that Osie's mitigation could not "counterbalance" it.

**{¶ 173}** Osie fails to demonstrate plain error with respect to the prosecutor's arguments. Accordingly, Part B of his 14th proposition is waived.

## VI. Sentencing Issues

### A. Allocution

**{¶ 174}** In his first proposition of law, Osie contends that the trial court violated Crim.R. 32(A)(1) by failing to ask him if he had anything to say before sentence was pronounced.

**{¶ 175}** To provide the necessary context for analysis of this claim, we begin with the penalty phase of Osie's trial. On April 29, 2010, after the parties had rested but before closing arguments commenced, the trial court had the following exchange with Osie and his counsel:

> JUDGE POWERS: * * * All right, Mr. Howard [defense counsel], does Mr. Osie have anything he'd like to say by way of allocution?
>
> MR. HOWARD: No, Your Honor.

JUDGE POWERS: Does he understand that he can make an unsworn statement here today?

MR. HOWARD: He does, Your Honor.

JUDGE POWERS: And he understands that if he made such an unsworn statement, unless—it not being a sworn statement, he would not be cross-examined in this matter?

MR. HOWARD: He does, Your Honor.

JUDGE POWERS: All right. And you've explained all of that to him?

MR. HOWARD: We have.

JUDGE POWERS: Do you understand that, Mr. Osie?

DEFENDANT: Yes.

{¶ 176} On May 3, 2010, the panel held a sentencing hearing, at which it sentenced Osie to death on Count 2 and also imposed sentences for the noncapital offenses. At this hearing, the panel did not ask Osie whether he wished to make a statement in his or her own behalf.

{¶ 177} A week later, on May 10, the panel held a second sentencing hearing. The judge presiding over the case explained that at the original sentencing on May 3, the trial court had

> failed to advise the defendant regarding the application of post-release control to the sentence imposed by the Court in this matter. As a result thereof, the Court believes that that sentence or a portion thereof was void, and that the defendant must be resentenced to correct that error, the same to include an advice on the application of post-release control to this matter. Accordingly,

the Court has brought Mr. Osie forward here today to perform that duty.

{¶ 178} The court then addressed Osie's counsel, asking whether they desired to put anything on the record; they declined. Immediately thereafter, the court addressed Osie personally: "Does Mr. Osie wish to say anything?" Osie replied: "No, Your Honor." The court then proceeded to read the sentencing opinion into the record and reimposed sentence on Osie for each of the offenses (both capital and noncapital) of which he had been convicted.

{¶ 179} Crim.R. 32(A)(1) provides: "At the time of imposing sentence, the court shall * * * [a]fford counsel an opportunity to speak on behalf of the defendant and address the defendant personally and ask if he or she wishes to make a statement in his or her own behalf or present any information in mitigation of punishment." The rule applies to capital cases. *State v. Campbell*, 90 Ohio St.3d 320, 738 N.E.2d 1178 (2000), paragraph two of the syllabus. Moreover, "[i]n a case in which the trial court has imposed sentence without first asking the defendant whether he or she wishes to exercise the right of allocution created by Crim.R. 32(A), resentencing is required unless the error is invited error or harmless error." *Id*., paragraph three of the syllabus.

{¶ 180} The state argues that the trial court complied with Crim.R. 32(A)(1) at the May 10 resentencing hearing when it asked Osie whether he "wish[ed] to say anything" and Osie declined. We agree. The trial court clearly regarded the sentence imposed at the May 3 hearing as void. Therefore, the May 10 hearing was "the time of imposing sentence" for purposes of Crim.R. 32(A)(1). At that hearing, the trial court asked Osie whether he wished to say anything, and Osie said that he did not. The court gave Osie everything he was entitled to under Crim.R. 32(A)(1).

**{¶ 181}** Osie contends, however, that the opportunity he was offered to speak at the May 10 resentencing hearing appeared to have been "directed only towards the non-capital counts." Citing our decision in *State v. Green*, 90 Ohio St.3d 352, 738 N.E.2d 1208 (2000), Osie contends that at the May 10 hearing, the trial court should have "unambiguously" asked him if he had anything to say before he was sentenced on his capital counts.

**{¶ 182}** In *Green*, we determined that a trial court had failed to comply with Crim.R. 32(A)(1), even though the court had asked the defendant whether he had anything to say before he was sentenced. Our holding in *Green* was based, in part, on the failure of the trial court in that case to make clear whether the court was inviting the defendant to make a statement about the capital counts as well as the noncapital counts: "The context suggests that the court may have solicited comment only on the noncapital offenses." *Id.* at 359.

**{¶ 183}** Osie argues that this case resembles *Green*, in that "the context of the trial court's request here suggested that the court was only soliciting comment on the post-release control issue." We cannot agree.

**{¶ 184}** Before asking Osie on May 10 if he wished to say anything, the trial court had explained in open court that in its opinion, the sentence imposed on May 3, or a portion thereof, was void. It was evident from the trial court's remarks that it regarded the *entire* sentence imposed on May 3 as being rendered void (at least potentially) by the postrelease-control error. The stated purpose of the resentencing was "to correct that error," which threatened to render the sentence void; from the trial court's perspective, anything less than a complete resentencing would risk failing to completely correct the error.

**{¶ 185}** Therefore, it should have been—and almost certainly was—obvious to Osie that the trial court intended to resentence him on *all* counts, including the capital counts. That being the case, it was equally clear that the trial court's direct invitation to Osie to "say anything" *also* covered all counts,

including the capital counts. We find no ambiguity in that invitation and therefore reject Osie's proposed analogy to *Green*. Accordingly, Osie's first proposition of law is overruled.

### B. Failure to Merge Death Specifications

{¶ 186} In the penalty phase of a capital case, "where two or more aggravating circumstances arise from the same act or indivisible course of conduct and are thus duplicative," they will be merged for sentencing purposes. *State v. Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264 (1984), paragraph five of the syllabus. In his fourth proposition of law, Osie contends that the trial court erred by failing to merge the felony-murder/burglary specification, R.C. 2929.04(A)(7), and the witness-murder specification, R.C. 2929.04(A)(8). Osie argues that the specifications should have merged on authority of *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239. For the reasons that follow, we agree; however, the error can be corrected by our independent review, and so there is no need to remand this case for resentencing.

{¶ 187} In *Fry*, the defendant was convicted of aggravated murder with specifications for aggravated burglary and witness-murder. The trial court merged the two specifications, but failed to so instruct the jury. On appeal, the state argued that the trial court's error was harmless because those two specifications should not have merged in the first place. We rejected that argument:

> The state argues that the two specifications did not merge because the evidence proving these offenses was separate and distinct. However, * * * Fry unlawfully entered Knox's residence on July 31 to kill [the victim] either in retaliation for filing a criminal complaint against him or to prevent her from testifying against him in future criminal proceedings. He murdered her

shortly after entering the residence. Thus, Fry's actions in killing [the victim] during an aggravated burglary and killing her because she was a witness were "inextricably intertwined, and thereby constituted one indivisible course of conduct."

*Id.* at ¶ 181, quoting *State v. Garner*, 74 Ohio St.3d 49, 54, 656 N.E.2d 623 (1995).

{¶ 188} In this case, as in *Fry*, Osie's object in trespassing in Williams's home, and also his reason for killing Williams, was to prevent him from filing a criminal complaint against him or Patterson. Moreover, the trespass, and therefore the aggravated burglary, did not begin until Osie began to assault Williams. Consequently, Osie's actions in killing Williams during an aggravated burglary and killing him because he was a witness appear to be "inextricably intertwined" and hence "constituted one indivisible course of conduct." *Garner* at 54.

{¶ 189} We can cure any error related to the duplicative specifications by merging the two specifications as part of our independent sentence review. *Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, at ¶ 183, citing *State v. Mitts*, 81 Ohio St.3d 223, 232, 690 N.E.2d 522 (1998).

C. Sufficiency of Evidence of Death Specifications:

Witness-Murder Specification

{¶ 190} In his third proposition of law, Osie contends that the state failed to present evidence sufficient to convict him on the R.C. 2929.04(A)(8) witness-murder specification.

{¶ 191} Under R.C. 2929.04(A)(8), a person who commits aggravated murder is guilty of a capital specification if

[t]he victim of the aggravated murder was a *witness to an offense* who was purposely killed *to prevent the victim's testimony in any criminal proceeding* and the aggravated murder was not committed during the commission, attempted commission, or flight immediately after the commission or attempted commission of the offense to which the victim was a witness * * *.

(Emphasis added.) Osie's principal argument here is that unless a formal criminal proceeding has actually commenced, a victim cannot have been killed to prevent his or her testimony "in any criminal proceeding" within the meaning of R.C. 2929.04(A)(8).

{¶ 192} Osie argues that since no formal criminal charges had been filed against anyone with regard to the alleged thefts from UCU, there was no "criminal proceeding." And because there was no criminal proceeding, Osie contends, R.C. 2929.04(A)(8) could not apply to the murder of Williams, even though that murder was committed for the purpose of preventing Williams from complaining to law-enforcement authorities about the alleged thefts.

{¶ 193} As Osie recognizes, we have squarely held just the opposite. In *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, we held:

R.C. 2929.04(A)(8) does not require that a criminal action be pending when the defendant kills the victim-witness. Indeed, we have previously upheld application of the witness-murder specification in situations where no criminal proceeding had been initiated at the time the victim was murdered. * * * The plain language of the statute requires only (1) that the victim was a

52

witness to an offense and (2) that the purpose of killing the victim was to prevent the victim from testifying in a criminal proceeding.

*Id.* at ¶ 55. However, Osie urges us to reexamine *Conway* in light of our later decision in *State v. Malone*, 121 Ohio St.3d 244, 2009-Ohio-310, 903 N.E.2d 614, in which we construed a different statute that defines a different offense.

**{¶ 194}** *Malone* holds that "a conviction for intimidation of a witness under R.C. 2921.04(B) is not sustainable when the intimidation occurred after the criminal act but prior to any proceedings flowing from the criminal act in a court of justice." *Id.* at ¶ 10.

**{¶ 195}** We cannot agree with Osie that *Malone* has any application to this case. Former R.C. 2921.04(B), the witness-intimidation statute construed in *Malone*, stated:

> No person, knowingly and by force or unlawful threat of harm to any person or property, shall attempt to influence, intimidate, or hinder the victim of a crime in the filing or prosecution of criminal charges or an attorney or *witness involved in a criminal action or proceeding* in the discharge of the duties of the attorney or witness.

(Emphasis added.) 146 Ohio Laws, Part I, 528. The defendant in *Malone* was prosecuted under the provision covering threats to a "witness involved in a criminal action or proceeding." Therefore, "[t]he question [was] whether [the witness] was 'involved in a criminal action or proceeding' at the time the threat was made." *Id.* at ¶ 14.

**{¶ 196}** We relied on the specific language of R.C. 2921.04(B) to support our holding in *Malone*. Crucial to our construction of "criminal action or

proceeding" in that case was the statute's requirement that the witness be "involved in" such an action or proceeding. R.C. 2921.04(B) "requires a witness's *involvement* in a criminal action or proceeding, not his or her potential involvement." (Emphasis added.) *Id.,* 121 Ohio St.3d 244, 2009-Ohio-310, 903 N.E.2d 614, at ¶ 21. "The statute simply does not apply to witnesses or attorneys who *might* become involved in a criminal action or proceeding. It applies only to witnesses and attorneys who *are involved* in a criminal action or proceeding." (Emphasis sic.) *Id*. at ¶ 25.

{¶ 197} *Malone*'s construction of R.C. 2921.04(B) provides no basis for overruling *Conway*'s construction of R.C. 2929.04(A)(8). Unlike R.C. 2921.04(B), R.C. 2929.04(A)(8) is not limited to a witness who is "involved in" a criminal proceeding. Rather, R.C. 2929.04(A)(8) speaks of "a witness to an offense who was purposely killed to *prevent* the victim's testimony in *any* criminal proceeding." (Emphasis added.) The language "to prevent" indicates that the defendant's motive is to affect a future proceeding. Moreover, R.C. 2929.04(A)(8) uses the broad, inclusive term "any" criminal proceeding. Consequently, a murder committed for the purpose of preventing the victim's testimony in a future or potential criminal proceeding is well within the statute's reach.

{¶ 198} Osie further contends that even if we reject his proposed reinterpretation of the R.C. 2929.04(A)(8) witness-murder specification, the evidence supporting that specification was still insufficient to convict him of it. He claims: "There is simply no evidence that Osie intended to kill Williams to prevent his testimony at a later trial."

{¶ 199} But the term "testimony in any criminal proceeding" is not limited to *trial* testimony. In *State v. Filiaggi*, 86 Ohio St.3d 230, 248, 714 Ohio St.3d 867 (1999), we interpreted the term "testimony in any criminal proceeding" to include the filing of a complaint accusing another of a criminal

offense. *See also State v. Turner*, 105 Ohio St.3d 331, 2005-Ohio-1938, 826 N.E.2d 266, ¶ 53-55.

{¶ 200} Nicholas Wiskur testified that in a phone conversation on February 13, Williams told Osie that he intended to file charges with respect to the missing money. Wiskur further testified that the conversation became heated on both sides, indicating that Osie was angry with Williams. Osie admitted in his confession that he went to Williams's house to discuss the matter with him. Osie told the Butler County detectives that Williams had said that he was going to press charges against Patterson for stealing from him. Additionally, he told his cellmate that Williams had expressed his intention to press charges against Osie himself. These statements by Williams precipitated the quarrel that ended with Osie stabbing Williams to death. From this evidence, the trier of fact could reasonably infer that when Osie stabbed Williams, he did so with the purpose of preventing Williams from filing charges against Osie and/or Patterson.[9]

{¶ 201} Osie contends that Williams's murder stemmed from "an argument between the two men that got out of hand." But the very subject of that argument was Williams's intention to file charges. That hardly precludes the inference that Osie's purpose in stabbing Williams was to keep him from filing charges.

{¶ 202} Osie's texts to Patterson corroborate his purpose of preventing Williams from filing charges against Patterson. At 3:07 a.m., Osie texted Patterson: "Baby doll your dirt is ready to be over." At 4:24 a.m., he texted her: "Job finished."

---

[9] R.C. 2929.04(A)(8) does not require that prevention of testimony or retaliation for testimony be the *only* reason for the murder. See *Filiaggi*, 86 Ohio St.3d at 248, 714 N.E.2d 867 ("The law does not require [the filing of the complaint] to be the sole reason").

**{¶ 203}** The state's evidence was legally sufficient to prove Osie's guilt of the R.C. 2929.04(A)(8) specification. We overrule Osie's third proposition of law.

Robbery-Murder Specification

**{¶ 204}** In his 11th proposition of law, Osie argues that the evidence was insufficient to prove the R.C. 2929.04(A)(7) felony-murder specification predicated on aggravated robbery. According to Osie, the state failed to prove an aggravated robbery took place, because the trial court found in its sentencing opinion that the theft of Williams's property was an afterthought.[10]

**{¶ 205}** Because aggravated robbery requires that the defendant inflict serious physical harm "in * * * committing a theft offense," R.C. 2911.01(A)(3), Osie contends that the intent to steal must coincide with the infliction of physical harm on the victim. According to Osie, physical harm inflicted before the formation of an intent to commit theft does not elevate a subsequent theft into an aggravated robbery.

**{¶ 206}** However, in *State v. Smith*, 61 Ohio St.3d 284, 574 N.E.2d 510 (1991), we rejected a similar argument under an earlier version of R.C. 2911.01. In *Smith*, the defendant argued that "the evidence fails to establish that his intent to take [the victim's] property or the actual taking of the property coincided with his threat or use of force and hence he is not guilty of aggravated robbery." *Id.* at 290. We rejected this argument and held that "the victim of a robbery, killed just prior to the robber's carrying off her property, is nonetheless the victim of an aggravated robbery." *Id*.

**{¶ 207}** Osie also argues that he is not guilty of the aggravated-robbery death specification under R.C. 2929.04(A)(7), because the murder was not committed "while" committing a robbery or fleeing afterward. But it is well

---

[10] The sentencing opinion stated that the aggravated robbery "was more related to the cover-up, in terms of trying to make the murder look like a burglary gone awry."

settled that the R.C. 2929.04(A)(7) specification does not require that the killing occur at the same instant as the underlying felony, that the killing be caused by the underlying felony, *State v. Cooey*, 46 Ohio St.3d 20, 23, 544 N.E.2d 805 (1989), or that the intent to commit the underlying felony precede the murder, *State v. Williams*, 74 Ohio St.3d 569, 660 N.E.2d 724 (1996), paragraph one of the syllabus. All that is required is that the killing must be directly associated with the underlying felony as part of one continuous occurrence. *State v. Cooper*, 52 Ohio St.2d 163, 179-180, 370 N.E.2d 725 (1977). Accordingly, we overrule Osie's 11th proposition of law.

## D. Trial Panel's Sentencing Opinion

{¶ 208} In his fifth proposition of law, Osie contends that the three-judge panel's sentencing opinion is flawed.

{¶ 209} First, he reiterates his claim that the panel should have merged the burglary-murder and witness-murder specifications. As discussed above in relation to Osie's fourth proposition, this claim has merit. However, it can be corrected by this court's independent sentence review.

{¶ 210} Second, he claims that the trial court failed to explain why the aggravating circumstances outweighed the mitigating factors. "This claim lacks merit because the opinion contains extensive discussion of the aggravating circumstances and the mitigating factors." *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 360. The opinion thoroughly discusses each aggravating circumstance and mitigating factor and explains why the court assigned each one the weight it did. Therefore, "the opinion as a whole adequately explains" why the aggravating circumstances outweighed the mitigating factors. *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 154.

{¶ 211} Third, Osie argues that the trial court "improperly diminished" his mitigating evidence—specifically, his drug use on the day before the

killing—by dismissing it as voluntary. But we have repeatedly stated that "[v]oluntary intoxication generally deserves little weight as a mitigating factor." *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 305. In any event, the "assessment and weight to be given mitigating evidence are matters for the trial court's determination." *State v. Lott*, 51 Ohio St.3d 160, 171, 555 N.E.2d 293 (1990).

{¶ 212} Finally, Osie argues that the trial court gave excessive weight to the witness-murder specification, turning it into a " 'super' aggravating circumstance" that carries what amounts to an automatic death sentence. The panel wrote that the witness-murder specification was the "most compelling" because

> [i]t represents a threat, an attack, not only upon the victim, but upon the criminal justice system itself. Defendant silenced Mr. Williams to subvert justice, to prevent Mr. Williams from lawfully seeking justice and redress in the Courts of this State. This specification the panel gives its most weight, great weight.

We have similarly observed: "Murdering a witness to prevent his or her testimony strikes at the heart of the criminal justice system." *State v. Keene*, 81 Ohio St.3d 646, 671, 693 N.E.2d 246 (1998).

{¶ 213} In *State v. Jones*, 91 Ohio St.3d 335, 744 N.E.2d 1163 (2001), we rejected a similar argument: that a trial court had elevated the R.C. 2929.04(A)(6) specification for murder of a law-enforcement officer into a super-aggravating circumstance that no mitigation could equal or outweigh. In *Jones*, the trial court stated that killing a police officer who was trying to apprehend a felon "strikes at the very heart of the justice system." We observed: "The trial court's statement regarding the severity of killing a police officer was

58

not improper. Courts are certainly entitled to consider the gravity of the aggravating circumstances." *Id.* at 352.

{¶ 214} No legal errors appear in the sentencing opinion. "Moreover, our independent review of the sentence will cure any flaws in the trial court's opinion." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 298. Osie's fifth proposition of law is overruled.

## VII. Ineffective Assistance

{¶ 215} In his 12th proposition of law, Osie claims that he received ineffective assistance from his trial counsel. To establish ineffective assistance, Osie must show (1) deficient performance by counsel, i.e., performance that fell below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington*, 466 U.S. at 687-688 and 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus.

{¶ 216} Osie divides his ineffective-assistance claims into three categories: those involving the pretrial stage of proceedings, those involving the trial itself, and those involving the penalty phase. We note that Osie presents these claims in almost completely conclusory terms, with little or no specific explanation of why trial counsel's acts and omissions fall below an objective standard of reasonable representation and how they were prejudicial. With that preliminary observation, we turn to Osie's individual claims of ineffective assistance

### Pretrial

{¶ 217} The defense filed a motion to appropriate funds for an investigator, which the trial court granted. Osie asserts that defense counsel nonetheless failed to hire an investigator. However, Osie does not explain what factual basis, if any, he has for this assertion. He points to nothing in the record to

demonstrate that defense counsel failed to hire an investigator. In fact, defense counsel referred during trial to an investigator, in such a way as to imply that they had hired one. When the defense complained to the trial court about receiving late disclosure of Donald Simpson's felony record, defense co-counsel said that had counsel known about Simpson's record sooner, "we certainly would have given the name or * * * information to the private investigator to investigate any further * * *." Osie's claim lacks support in the record.

{¶ 218} Osie contends that the defense should have filed a motion to suppress the "attorney work product" seized from Osie's cell. As discussed in reference to Osie's seventh proposition of law, the only alleged work product admitted into evidence at trial was State's Exhibit 64, Osie's letters to Patterson, which were neither confidential nor "attorney work product."

{¶ 219} Osie contends that the defense should have objected to the admission of Osie's confession on the grounds that the police did not record the entire interview. This claim fails because, as discussed in relation to Osie's 18th proposition of law, it rests on a novel theory unsupported by existing Ohio law. "It is not ineffective assistance for a trial lawyer to maneuver within the existing law, declining to present untested * * * legal theories." *State v. McNeill*, 83 Ohio St.3d 438, 449, 700 N.E.2d 596 (1998). *See also Ledbetter v. Commr. of Corr.*, 275 Conn. 451, 461-462, 880 A.2d 160 (2005) (collecting cases).

{¶ 220} Osie contends that the defense should have requested a competency evaluation. The test for competence to stand trial is whether "the defendant is incapable of understanding the nature and objective of the proceedings against the defendant or of assisting in the defendant's defense." R.C. 2945.37(G).

{¶ 221} Osie contends that an evaluation was called for because he "demonstrated a disjointed understanding of the proceedings and discovery revealed unhealthy personal relationships." But Osie supports his claim of

"disjointed understanding" only by unexplained citations to the transcript. Osie does not explain how these citations demonstrate that he was unable to understand the proceedings.

{¶ 222} Osie supports his claim of "unhealthy personal relationships" by referring to State's Exhibit 64, his letters to Patterson. The letters arguably do exhibit unhealthy relationships, but nothing in them suggests that Osie lacked the ability to understand the proceedings or assist in his own defense.

{¶ 223} Osie complains that defense counsel "[f]ailed to retain a proper mitigation specialist." But hiring a mitigation specialist is not a requirement of effective assistance. *State v. McGuire*, 80 Ohio St.3d 390, 399, 686 N.E.2d 1112 (1997). Nor does Osie explain why Pagan, whose services Osie's defense counsel had used before, was not a "proper mitigation specialist." Therefore, he fails to demonstrate either deficient performance or prejudice.

{¶ 224} Osie contends that defense counsel "[f]ailed to ensure that the three-judge panel was created in accordance with R.C. § 2945.06." This claim fails because, as discussed with regard to Osie's ninth proposition of law, the panel was created in accordance with R.C. 2945.06.

{¶ 225} Osie contends that defense counsel "[f]ailed to ensure that Osie had a proper understanding of the jury waiver and its subsequent consequences." To the contrary, as discussed in connection with Osie's tenth proposition, the record demonstrates that Osie did have a sufficient understanding of his right to a jury trial to waive it.

Trial

{¶ 226} Osie contends that defense counsel should have asked the trial court to seal witness statements for appellate review. He cites no authority for the proposition that such an omission constitutes ineffective assistance of counsel. Moreover, he offers no analysis to explain why the statements should have been sealed or how the claimed omission meets the *Strickland* criteria of deficient

performance and prejudice. Hence, he fails to carry his burden of showing ineffective assistance with respect to this claim.

{¶ 227} Osie contends that his counsel failed to object to numerous instances of prosecutorial misconduct. Osie cross-references his 14th proposition of law, which challenges two instances of alleged misconduct in the guilt phase: delayed disclosure of alleged *Brady* material and the seizure and admission of attorney work product. But, as discussed earlier in connection with Osie's seventh proposition, Osie's letters to Patterson were not shown to be attorney work product. And, as discussed earlier in connection with Osie's eighth proposition, he has made no showing that the delayed disclosure of the alleged *Brady* material was prejudicial.

Mitigation

{¶ 228} Defense counsel's mitigation evidence consisted of testimony by Osie's family (his mother, brother, and son) and two longtime friends, who testified about his childhood, his reaction to his father's death, and his drug habit. Osie contends that counsel should have conducted a more thorough investigation and presented more evidence about Osie's "background, education, mental and emotional stability [and] family relations," as well as expert testimony to explain the effects of cocaine on Osie's behavior.

{¶ 229} However, the record before us does not show what investigations Osie's counsel did or did not conduct. Nor does it show what further information counsel could have introduced about Osie's background, education, stability, or family relations. Osie cannot show either deficient performance or prejudice.

{¶ 230} Osie further contends that his counsel failed to ensure that Osie was afforded his right to allocution. However, as we explain in discussing Osie's first proposition of law, Osie was in fact permitted to make a statement to the trial court before finally being sentenced. He therefore received all that Crim.R. 32(A)(1) entitled him to. Moreover, Osie makes no attempt to show that there is a

reasonable probability that the result of the sentencing would have been otherwise—i.e., that he would have avoided a death sentence—had counsel taken action to secure Osie's right to allocution.

{¶ 231} Finally, Osie claims that his counsel failed to object to "numerous instances" of penalty-phase prosecutorial misconduct. Again, Osie cross-references his 14th proposition of law, which identifies three instances of claimed misconduct in the penalty-phase closing argument. As discussed in the section dealing with that proposition, none of these claims have merit.

{¶ 232} Osie fails to show how any of his ineffective-assistance claims fulfill the *Strickland* criteria of deficient performance and prejudice. Accordingly, his 12th proposition of law is overruled.

VIII. Settled Issues

A. Constitutionality of Felony-Murder Specification

{¶ 233} In his 13th proposition of law, Osie claims that the felony-murder specification defined in R.C. 2929.04(A)(7) unconstitutionally fails to narrow the class of offenders sentenced to death, because it duplicates the elements of felony-murder, R.C. 2929.03.01(B). We have repeatedly rejected such claims. *See, e.g., State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 185; *State v. Henderson*, 39 Ohio St.3d 24, 28-29, 528 N.E.2d 1237 (1988). *See also Williams v. Taylor*, 529 U.S. 362, 392, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), fn. 16, citing *Lowenfield v. Phelps*, 484 U.S. 231, 108 N.E.2d 546, 98 L.Ed.2d 568 (1988). Osie's 13th proposition is overruled.

B. Constitutionality of Death Penalty

{¶ 234} In his 19th proposition of law, Osie claims that the death penalty and Ohio's statutory provisions for its administration are unconstitutional and violate international law. We have repeatedly rejected each of Osie's claims, and we overrule them summarily today. *See generally State v. Spisak*, 36 Ohio St.3d 80, 82, 521 N.E.2d 800 (1988) (summarily overruling propositions of law raising

long-settled legal arguments); *State v. Poindexter*, 36 Ohio St.3d 1, 520 N.E.2d 568, (1988), syllabus (approving summary disposition of settled issues in capital cases).

**{¶ 235}** Osie contends that Ohio's death-penalty scheme is arbitrary and administered in a racially discriminatory manner. We have rejected both arguments. *See Jenkins*, 15 Ohio St.3d at 168-169, 473 N.E.2d 264; *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 103 (Ohio's statutory scheme is not racially discriminatory), citing *State v. Steffen*, 31 Ohio St.3d 111, 124-125, 509 N.E.2d 383 (1987); *State v. Zuern*, 32 Ohio St.3d 56, 64-66, 512 N.E.2d 585 (1987) (same); *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 139.

**{¶ 236}** Osie contends that Ohio's death-penalty procedures are unreliable. This claim has been rejected. *See Jenkins* at 172-173; *State v. Stumpf*, 32 Ohio St.3d 95, 104, 512 N.E.2d 598 (1987). He further argues that Ohio's statutes unconstitutionally fail to provide individualized sentencing because they require proof of aggravating circumstances in the guilt phase. This claim, too, has been rejected. See *Henderson*, 39 Ohio St.3d at 28-29, 528 N.E.2d 1237; *Jenkins* at 178.

**{¶ 237}** Osie argues that Ohio's death-penalty scheme impermissibly burdens a capital defendant's right to a jury trial. This claim lacks merit. See *State v. Buell*, 22 Ohio St.3d 124, 138, 489 N.E.2d 795 (1986), citing *State v. Nabozny*, 54 Ohio St.2d 195, 375 N.E.2d 784 (1978), paragraph one of the syllabus, *overruled on other grounds*, 439 U.S. 811, 99 S.Ct. 70, 58 L.Ed.2d 103 (1978).

**{¶ 238}** Osie argues that R.C. 2929.03(D)(1) is unconstitutional because it provides that if the defendant requests a presentence investigation or a court-ordered mental evaluation, the reports generated thereby must be provided to the

jury or the panel. We have rejected this argument. *See State v. Esparza*, 39 Ohio St.3d 8, 10, 529 N.E.2d 192 (1988); *Buell* at 138.

{¶ 239} Osie again argues that R.C. 2929.04(A)(7) is unconstitutional because it repeats the definition of felony-murder set forth in R.C. 2903.01(B). This claim mirrors Osie's 13th proposition of law, which we have already rejected.

{¶ 240} Osie argues that R.C. 2929.03(D)(1) and 2929.04 are unconstitutionally vague because they give the sentencer unfettered discretion to weigh the nature and circumstances of the offense as an aggravating circumstance. Osie's claim is incorrect. *See State v. McNeill*, 83 Ohio St.3d at 453, 700 N.E.2d 596, citing *Tuilaepa v. California*, 512 U.S. 967, 973-980, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994).

{¶ 241} Osie argues that Ohio's death-penalty scheme provides constitutionally inadequate appellate review of the proportionality and appropriateness of the death sentence. We reject this claim. *See Steffen*, 31 Ohio St.3d 111, 509 N.E.2d 383, paragraph one of the syllabus; *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 23.

{¶ 242} Osie contends that the death penalty violates various aspects of international law. He contends that Ohio imposes the death penalty in a racially discriminatory manner and thereby violates the Convention on Racial Discrimination. We rejected that claim in *Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 137. Osie's other international-law claims were also rejected in *Short*. *Id.* at ¶ 138 (rejecting claims under International Covenant on Civil and Political Rights, United Nations Convention against Torture, and customary international law).

{¶ 243} Osie's 19th proposition of law is overruled.

IX. Independent Sentence Review

{¶ 244} Under R.C. 2929.05(A), this court must independently review Osie's death sentence. We may affirm a death sentence "only if * * * persuaded from the record that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case and that the sentence of death is the appropriate sentence in the case." *Id.* We must also determine whether the evidence supports the panel's finding of aggravating circumstances and whether the death sentence is proportionate to those imposed in similar cases. *Id.*

{¶ 245} In his sixth proposition of law, Osie contends that on independent review, we should find that the aggravating circumstances do not outweigh the mitigating factors beyond a reasonable doubt.

Aggravating Circumstances

{¶ 246} Osie was convicted of three aggravating circumstances: witness-murder, R.C 2929.04(A)(8), felony-murder predicated on aggravated burglary, R.C. 2929.04(A)(7), and felony-murder predicated on aggravated robbery, R.C. 2929.04(A)(7). As discussed in connection with Osie's fourth proposition of law, the aggravated-burglary specification and the witness-murder specification merge, leaving only two specifications. We find that the evidence supports Osie's convictions of the aggravated-robbery and witness-murder specifications.

Mitigating Factors: History, Character, and Background

{¶ 247} Osie was 48 years old in 2010, when the trial took place. He grew up in a two-parent family with four siblings in the Camp Washington neighborhood of Cincinnati. Camp Washington was a former industrial area. According to some of Osie's mitigation witnesses, it had become a "tough" or "very bad" neighborhood by the 1960s, when Osie was growing up there. [11]

---

[11] On the other hand, while Osie's brother Kenneth described Camp Washington as a troubled neighborhood, he nonetheless called it "a good place to grow up." Osie's mother testified that the

66

Many of its children lacked two parents, failed to finish school, or got into trouble with the law.

{¶ 248} Despite the surroundings, it appears that Osie had a good upbringing. His younger brother Kenneth testified that "[t]here was a lot of trouble" in the neighborhood when they were growing up there, but "we [the Osie children] stayed away from that," thanks to having two strict and caring parents who instilled good values in their children. Family friend Paul Rudemiller also testified that Osie had stayed out of trouble as a youth; unlike many other children in the neighborhood, Osie "led a life that kept him away from the court system."

{¶ 249} Jim Egbert had been the pastor of a church in Camp Washington for 28 years. His was a "mission church" engaged in "community ministry" and "outreach." He testified that the entire Osie family had volunteered in the church's community programs, even though they did not belong to Egbert's church. Osie had been a "willing participant," although Egbert was unable to recall any specific activities that Osie had participated in.

{¶ 250} Osie played softball, baseball, basketball, and football and participated in the Cub Scouts. He organized and raised money for an adult softball team and volunteered for a summertime neighborhood-cleanup program. After graduating from high school, he took a job in a meatpacking plant, married, and had two children. He and his wife were separated for several years, but reunited when Osie's son Brian was in the eighth grade.

{¶ 251} Paul Rudemiller was the longtime president and executive director of the Camp Washington Community Board, Inc., a nonprofit tax-exempt corporation established for community organizing and neighborhood improvement. He was a friend of Osie's mother, who was "secretary and/or treasurer" of the Camp Washington Community Board.

_____

neighborhood contained "some rough hooligans" and "started going down" after the Osies moved there, but that it remained "a nice neighborhood" with "some very nice people."

**{¶ 252}** Rudemiller described Osie as "a decent kid" who graduated from high school, went to church, got a job, and got married. He believed that Osie "has many good parts" based on "the good things he has done in the 50 years [Rudemiller has] known him." Ten to 15 years earlier, when Osie separated from his wife, the community board had rented an apartment to him. "[H]e was a good tenant and probably one of the cleanest tenants we had," Rudemiller testified.

**{¶ 253}** Rudemiller knew that Osie drank and testified that Osie had had "one or two offenses involving excessive drinking," but he had never known Osie to have a drug problem. Rudemiller had last seen Osie at the funeral of Osie's father, which took place in 2006.

**{¶ 254}** Osie's 22-year-old son, Brian, was a college student. He testified that Osie had been an attentive parent. During Osie's first separation from his wife, Osie saw Brian every other weekend. When Brian was in the eighth grade, Osie and his wife reunited. In high school, Brian played baseball, and Osie attended his games regularly and coached him in a summer league.

**{¶ 255}** In 2006, Osie finally broke up with his wife, and Brian testified that Osie's behavior changed markedly after that. Osie began staying out all night, using drugs, and stealing from his mother.

**{¶ 256}** Osie's mother, Patricia, testified that Osie was a very well-behaved child, raised to be a "good, decent" person. As an adult, Osie used to visit his mother once a week. However, around 2007, Patricia began to notice changes in Osie. He lost his job around this time. He visited less often; when he did visit, he wanted to borrow money, something he had not done when employed.

**{¶ 257}** Sometime in 2008 or 2009, Osie called his mother to ask for money to make a payment on his truck. Osie, his mother, and someone she identified only as "the lady from the truck company" were on a three-way conference call, during which Osie's mother revealed her checking-account

number. After this happened, Patricia found that someone was withdrawing money from her account without her knowledge.

{¶ 258} Nevertheless, Patricia testified, she still loved her son, and it was important to her to maintain contact with him. She testified that she visited Osie every two weeks at the jail and intended to visit him in prison if he received a life sentence.

Sentence Evaluation

{¶ 259} Based upon the foregoing evidence, and upon the record of the guilt phase, Osie argues that the following mitigating factors exist:

{¶ 260} 1. Over most of his lifetime, he had been a productive member of society and an asset to his family and community. The evidence supports the existence of this factor. Osie was gainfully employed from his high school graduation until he lost his job in 2007. Along with his family, he took part to some degree in efforts to improve the Camp Washington neighborhood. His son Brian testified that he was a loving and involved father. These matters are all entitled to some weight in mitigation. *See State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 263 (testimony that defendant was a loving, supportive father entitled to weight); *State v. Fox*, 69 Ohio St.3d 183, 194, 631 N.E.2d 124 (1994) (steady employment since high school and favorable community reputation entitled to weight).

{¶ 261} 2. He "suffered a number of setbacks," particularly his father's death and his divorce, that caused his behavior to change. This is entitled to some weight as well.

{¶ 262} 3. He retains the love and support of his family. This is also entitled to some weight. *See, e.g.*, *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 263.

{¶ 263} 4. He had a drug habit, and alcohol and cocaine played a role in the murder. But "[v]oluntary intoxication is at most a weak mitigating factor,

entitled to little weight." *Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 111 (citing cases); *see also Turner*, 105 Ohio St.3d 331, 2005-Ohio-1938, 826 N.E.2d 266, ¶ 93.

**{¶ 264}** 5. He lacks a significant history of criminal convictions and delinquency adjudications. *See* R.C. 2929.04(B)(5). However, the defense has the burden of establishing the existence of mitigating factors, including the (B)(5) factor, and Osie did not place his criminal record, or lack thereof, in evidence. *See Jenkins,* 15 Ohio St.3d at 171, 473 N.E.2d 264. The only evidence on that subject came from Paul Rudemiller, who testified that Osie "had one or two offenses involving excessive drinking."[12]

**{¶ 265}** 6. He confessed and cooperated with the police after his arrest. "A defendant's confession and cooperation with law enforcement are mitigating factors." *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 191. But the mitigating value of this factor is reduced by the fact that Osie repeatedly lied to the detectives questioning him. *See State v. Perez,* 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 247 (citing cases).

**{¶ 266}** 7. His infatuation with Patterson and his "misplaced" desire to protect her played a significant role in the murder. The record does indeed suggest that Osie was motivated, at least in part, by a desire to protect Patterson.[13]

---

[12] The trial court's file, we note, contains a discovery response filed by the state, summarizing Osie's "known criminal record" as follows:

    1. Reckless Operation (2008 – Reduced DUI)
    2. Domestic Violence (2008 – Dismissed)
    3. DUI (2009)

But this information was not placed in evidence, nor does Osie cite it to support his contention that the R.C. 2929.04(B)(5) factor exists.

[13] Osie states in his brief that Patterson "had significant influence over the decisions [he] made," but cites nothing in the record to support this claim.

**{¶ 267}** Yet Osie's motives were far from wholly unselfish: Osie himself was potentially a target of a criminal complaint by Williams. The forged check was made out to him, and he cashed it. Moreover, according to the account of the murder Osie gave to his cellmate Simpson, the encounter between Osie and his victim "got heated" only when Williams threatened to file charges against Osie. It was at that point that Osie assaulted Williams. We find this factor entitled to little weight.

**{¶ 268}** 8. The murder "was the result of an argument that got out of control." According to Osie's confession and his statement to Simpson, he attacked Williams after they began to quarrel. However, Osie's repeated efforts to falsely shift blame to Williams throughout his confession cast doubt upon this claim, and we afford it little weight.

**{¶ 269}** Our independent review of the record discloses no further mitigating factors, either in the nature and circumstances of the offense or in the history, character, and background of the offender.

**{¶ 270}** Having independently weighed the aggravating circumstances against the mitigating factors, we find that the two aggravating circumstances of robbery-murder and witness-murder outweigh the mitigating factors present in this case beyond a reasonable doubt. "In particular, the R.C. 2929.04(A)(8) witness-murder specification is entitled to great weight, for it 'strikes at the heart of the criminal justice system.' " *Turner*, 105 Ohio St.3d 331, 2005-Ohio-1938, 826 N.E.2d 266, ¶ 100, quoting *State v. Jalowiec*, 91 Ohio St.3d 220, 239, 744 N.E.2d 163 (2001).

Proportionality

**{¶ 271}** We have approved death sentences "in cases where the witness-murder specification was present alone or in combination with one other specification, even when substantial mitigation existed." *Turner* at ¶ 101 (citing cases).

Conclusion

**{¶ 272}** We conclude that the aggravating circumstances outweigh the mitigating factors in this case beyond a reasonable doubt and that the death sentence in this case is appropriate and proportionate. Accordingly, we affirm Osie's convictions and sentence of death.

Judgment affirmed.

O'CONNOR, C.J., and PFEIFER and O'DONNELL, JJ., concur.

LANZINGER and FRENCH, JJ., concur in part and dissent in part.

O'NEILL, J., dissents.

_____

**LANZINGER, J., concurring in part and dissenting in part.**

**{¶ 273}** While I concur that the state proved the felony-murder specifications beyond a reasonable doubt, I would hold that the state did not present sufficient evidence to convict Gregory Osie of the R.C. 2929.04(A)(8) specification.

*The R.C. 2929.04(A)(8) Witness-Murder Specification*

**{¶ 274}** The United States Supreme Court has stated that the underlying principle in capital cases is that the death penalty is reserved for a narrow category of crimes and offenders. *Roper v. Simmons*, 543 U.S. 551, 568-569, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). Ohio's statute reflects this principle by allowing a death sentence only if the state proves beyond a reasonable doubt all elements of a specification charging an aggravating circumstance. R.C. 2924.04(A) sets forth ten categories of aggravating circumstances that, if proven beyond a reasonable doubt, make an offender eligible for the death penalty.

**{¶ 275}** One of the categories is R.C. 2929.04(A)(8), defining the witness-murder specification:

> The victim of the aggravated murder was a witness to an offense who was purposely killed *to prevent the victim's testimony in any criminal proceeding* and the aggravated murder was not committed during the commission, attempted commission, or flight immediately after the commission or attempted commission of the offense to which the victim was a witness, or the victim of the aggravated murder was a witness to an offense and was purposely killed in retaliation for the victim's testimony in any criminal proceeding.

(Emphasis added.)

{¶ 276} I cannot find that this specification was proven beyond a reasonable doubt in the case before us. The cases that the majority cites to uphold Osie's R.C. 2929.04(A)(8) conviction were cases decided before *State v. Malone*, 121 Ohio St.3d 244, 2009-Ohio-310, 903 N.E.2d 614. In *Malone*, we interpreted the meaning of the statutory phrase "a criminal action or proceeding" as that term was used in a former version of the witness-intimidation statute, R.C. 2901.04(B). 146 Ohio Laws, Part I, 528. Although the witness-murder specification is in a different statute, the same analysis should be used here to understand the meaning of the words "criminal proceeding."

*The Analysis in* State v. Malone

{¶ 277} Malone was charged with a violation of former R.C. 2921.04(B) as a result of making threats to a woman who had witnessed his rape of another woman. *Malone* did not turn on whether the victim intended to file a complaint and was prevented from filing it.

{¶ 278} Former R.C. 2921.04(B) stated:

No person, knowingly and by force or by unlawful threat of harm to any person or property, shall attempt to influence, intimidate, or hinder the victim of a crime in the filing or prosecution of criminal charges or an attorney or *witness involved in a criminal action or proceeding* in the discharge of the duties of the attorney or witness.

(Emphasis added.)

{¶ 279} We recognized a conflict on the following certified question:

Is a conviction for intimidation of a witness under R.C. 2921.04(B), which requires the witness to be involved in a criminal action or proceeding, sustainable where the intimidation occurred after the criminal act but prior to any police investigation of the criminal act, and thus, also prior to any proceedings flowing from the criminal act in a court of justice?

*State v. Malone*, 116 Ohio St.3d 1472, 2008-Ohio-153, 879 N.E.2d 781. We held that such a conviction was not sustainable. 121 Ohio St.3d 244, 2009-Ohio-310, 903 N.E.2d 614, at ¶ 10.

{¶ 280} We began our analysis in *Malone* by citing the rule of lenity. R.C. 2901.04(A) states that "sections of the Revised Code defining offenses or penalties shall be strictly construed against the state, and liberally construed in favor of the accused." Because the term "criminal action or proceeding" was undefined in the statute, we interpreted the term to mean "a formal process involving a court." *Id*. at ¶ 18. We defined the term "proceeding" as " 'the "[r]egular and orderly progress in form of law, including all possible steps in an action from its commencement to the execution of judgment. " [*Black's Law*

*Dictionary* 1204 (6th Ed.Rev.1990)].' " *Id.* at ¶ 16, quoting *State ex rel. Steckman v. Jackson*, 70 Ohio St.3d 420, 432, 639 N.E.2d 83 (1994). We concluded that because Malone made his threat before a criminal complaint had been made, a liberal construction in his favor meant that the statute could not apply. The *Malone* holding was reaffirmed in *State v. Davis*, 132 Ohio St.3d 25, 2012-Ohio-1654, 968 N.E.2d 466.

{¶ 281} We recently said in *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 162:

> R.C. 2929.04(A)(8) does not require that a criminal action be pending when the defendant kills the witness. Indeed, a defendant can be charged with the witness-murder specification in situations in which no criminal proceeding has been initiated at the time the victim was murdered. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 55. The statute requires only (1) that the victim was a witness to an offense and (2) that the purpose of killing the witness was to prevent the victim from testifying in a criminal proceeding. *Id.*

*Maxwell*, however, turned on the fact that the witness had given grand-jury testimony and was killed in retaliation. We did not analyze the import of the words "criminal proceeding" in light of our discussions in *Malone* and *Davis*.

{¶ 282} In this case, there was no evidence that Osie murdered Williams in retaliation for testimony Williams had already given, and thus, the question is whether Williams was a "witness to an offense who was purposely killed to prevent the victim's testimony in any criminal proceeding." The evidence showed beyond a reasonable doubt that Williams intended to press charges against both Osie and Patterson and that he was killed to prevent his filing a

complaint with the police. Indeed, the majority opinion focuses on this point alone, stating that "[t]o prove this specification, the state had to prove that Osie killed Williams for the purpose of preventing him from filing a criminal charge." Majority opinion at ¶ 121. That, however, is not what the statute says.

{¶ 283} R.C. 2929.04(A)(8) does not mention that an offender must purposely kill to prevent either the filing of a complaint or the initiation of criminal charges, which the evidence shows was the motivation for Osie's actions. Instead, the specification applies when the offender prevents the witness from *testifying* in criminal proceedings. The General Assembly could have chosen to create a specification that included language similar to the witness-intimidation statute, which brings within its scope "hinder[ing]" the victim of a crime or delinquent act "in the filing or prosecution of criminal charges." R.C. 2921.04(B)(1).[14] It did not do so.

---

[14] It is noteworthy that after *Malone* was decided, the General Assembly enacted 2011 Sub.H.B. No. 20, effective June 4, 2012, that clarified the scope of the intimidation statute by amending subsection (B) and adding subsection (E):

> (B) No person, knowingly and by force or by unlawful threat of harm to any person or property or by unlawful threat to commit any offense or calumny against any person, shall attempt to influence, intimidate, or hinder any of the following persons:
> (1) The victim of a crime or delinquent act in the filing or prosecution of criminal charges or a delinquent child action or proceeding;
> (2) A witness to a criminal or delinquent act by reason of the person being a witness to that act;
> (3) An attorney by reason of the attorney's involvement in any criminal or delinquent child action or proceeding.
> * * *
> (E) As used in this section, "witness" means any person who has or claims to have knowledge concerning a fact or facts concerning a criminal or delinquent act, *whether or not criminal or delinquent child charges are actually filed.*

(Emphasis added).

*Conclusion*

{¶ 284} Osie was convicted of the R.C. 2929.04(A)(8) specification because he attempted to prevent Williams from going to the police to file a complaint. This is not proof of the specification within its stated terms.

{¶ 285} I concur in the judgment insofar as it affirms Gregory Osie's convictions on Count One, aggravated murder with prior calculation and design, and Count Two, felony-murder, as well as on the aggravating circumstances of felony-murder in the commission of aggravated robbery and aggravated burglary under R.C. 2929.04(A)(7) for each of those offenses. But I would vacate the conviction of the aggravating circumstance under R.C. 2929.04(A)(8) for both offenses and remand this case for resentencing.

FRENCH, J., concurs in the foregoing opinion.

_____

**O'NEILL, J., dissenting**.

{¶ 286} In *State v. Kirkland*, Slip Opinion No. 2014-Ohio-1966, this court affirmed a death sentence despite its acknowledgment that the defendant's penalty-phase hearing was unfair, based on its independent review of the sentence. *Id.* at ¶ 98 and ¶ 141-168. I dissented, pointing out that the court's analysis and decision were in violation of *Ring v. Arizona*, 536 U.S. 584, 609, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). *See Kirkland* at ¶ 201-204 (O'Neill, J., dissenting).

{¶ 287} The court repeats that error today, holding that while the trial court in this case failed to merge "duplicative [death] specifications," majority opinion at ¶ 189, this court's independent sentence review can "cure" any error as part of our "independent sentence review." *Id.* I rejected this analysis in *Kirkland* and I reject it again. It is illogical and unsupported by the law. I do not believe that Osie's choice to have his case heard by a three-judge panel resolves the issue. If there is inarguable and prejudicial error in the imposition of a death sentence, it

should be elementary that a new sentencing is required. We do not engage in post hoc justification of the result when reviewing prison sentences. *See State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, paragraph two of the syllabus ("Upon finding reversible error in the imposition of multiple punishments for allied offenses, a court of appeals *must reverse the judgment of conviction and remand for a new sentencing hearing * * *"* [emphasis added]). This is a death sentence, and "good enough" is unacceptable.

**{¶ 288}** At the bottom line, a sentence of death should never have been imposed in this case. While acknowledging Osie's contention that Williams's murder stemmed from an argument between the two men that got out of hand, the majority suggests that because the "subject of that argument was Williams's intention to file charges," it was proper to adopt "the inference that Osie's purpose in stabbing Williams was to keep him from filing charges." Majority opinion at ¶ 201. It is true that the factfinder may rely upon an inference to conclude that sufficient evidence of an offense has been presented. *See State v. Jordan,* 89 Ohio St.3d 488, 733 N.E.2d 601 (2000). But it is another thing altogether to conclude that the very same "inference" is also sufficient to justify the imposition of a death sentence. The majority makes a quantum leap in reaching its conclusion that inference outweighs all of the mitigating evidence presented by the defendant beyond a reasonable doubt. This record simply does not provide any support for that decision.

**{¶ 289}** Defendant's girlfriend was suspected of stealing approximately $18,000 from her employer, David Williams. She was the office manager at a struggling company and was thought to be using phony payroll checks to steal money. One of the checks for $375 was made out to the defendant, and he cashed it at a gas station in front of a video camera. The undisputed facts are that on the night of the murder, the defendant went to Williams's house to attempt to persuade him not to report the thefts to the police. The state's own jailhouse

informant testified that defendant had told him that prior to going to Williams's house, he got high on cocaine and that defendant only went to Williams's house to "talk [Williams] out of pressing charges." The conversation became heated, and Williams indicated that the police would investigate the $375 check. When questioned by the police, the defendant lied multiple times but ultimately confessed to killing Williams. According to the informant, Donald Simpson Jr.:

> I guess it had turned into Greg trying to talk him out of pressing charges, and I—he had said the conversation had come up that he was going to press charges on Greg himself, because one of the checks had been wrote and cashed at a Marathon gas station there on Cincinnati-Dayton and Tylersville. It had been wrote to Greg himself, and I guess at that point, he said that the conversation had got heated and that he had punched Dave, and then it just happened that, I mean before he knew it, he had got the knife and stabbed him. He had stabbed him like four or five times in the chest, and that then when he was laying there, that he freaked out, and so he rushed down and took the knife and sliced his throat.

{¶ 290} The defendant clearly deserves severe punishment—he admits he killed another. But the question before the three-judge panel was whether the motive behind the murder was to silence his girlfriend's employer, who was threatening to go to the police over her embezzlement of company funds. There were only two witnesses to the fight that turned fatal: the decedent and the defendant. And before the state of Ohio, in the name of its citizens, can take another life, it must demonstrate beyond a reasonable doubt that the motive to silence this witness was the driving force behind the fatal act. Other than the

death, there is no direct evidence and precious little circumstantial evidence of that intent. Accordingly, I would hold as a matter of law that the state has failed in that endeavor. A reasonable interpretation of what happened here is that an ugly confrontation turned into a physical altercation that ended up with one person dying and another fleeing, and any basis for rejecting that interpretation can only be inferred from the killing itself. As a result, the same inference that provides the legal basis for convicting the defendant of aggravated murder also provides the basis for the specification making the defendant eligible for death. That is a legally insufficient process in a capital-murder case.

{¶ 291} The undisputed evidence is that the defendant initially went to Williams's house to talk to him, not to kill him. To arrive at the majority's tortured conclusion, the specific purpose to kill a witness to prevent him from testifying about a crime that has not yet even been reported to the police must be inferred from circumstances surrounding the killing. Have we really arrived at the point where we are willing to execute someone based upon an inference? And are we now ready to simply ignore the perfectly reasonable contrary view of the offense that the killing simply stemmed from an argument where the defendant, high on cocaine, lost control of himself?

{¶ 292} And ultimately, even if the answer to those questions is "yes," simple justice demands that a speculative finding of inferred specific purpose cannot, standing alone, outweigh the mitigation evidence presented by the defendant. The evidence is undisputed that the defendant was a good, productive, and law-abiding member of society for many years. He consistently worked, volunteered for the benefit of the community, and raised two adult sons. In his lifetime he has only one prior conviction, for OVI. His four siblings, his sons and his mother all love him and want him to be part of their lives even if he's in prison.

{¶ 293} The roots of this crime stem from the virtually simultaneous collapse of the defendant's marriage and the death of his father. These two events sent the defendant into a downward spiral that led to abuse of alcohol and cocaine, embezzlement from his mother, and finally the horrible murder of which he stands convicted. The defendant made good decisions for 45 years, bad decisions for three years, and awful decisions for one night.

{¶ 294} Given the undisputed evidence, our independent sentence review cannot support the conclusion that death, rather than life in prison with or without a chance of parole, is the appropriate sentence in this case. This is a case of two men in a very contentious situation that got out of hand and that left one of them dead. In weighing mitigation versus aggravation, I am persuaded by the first 45 years of the defendant's life, during which he kept a job, raised a family, and put two kids through college. The defendant is not someone who kills his mother-in-law and slashes his two children's throats. *See State v. Mammone*, Slip Opinion No. 2014-Ohio-1942, 2014 WL 1924815. The defendant is not someone who rapes two teenagers and then sets their bodies on fire. *See State v. Kirkland*, Slip Opinion No. 2014-Ohio-1966, 2014 WL 1924813. No, the defendant is a man who went down the wrong path, with a tragic ending for Mr. Williams and his survivors. Society gets no benefit from executing this defendant, and his crimes are not the type of offenses that can even arguably justify the imposition the punishment of death. I accordingly dissent.

_____

Michael T. Gmoser, Butler County Prosecuting Attorney, Michael A. Oster Jr., Chief, Appellate Division, and Lina N. Alkamhawi, Assistant Prosecuting Attorney, for appellee.

Timothy Young, Ohio Public Defender, Pamela Prude-Smithers, Chief Counsel, Death Penalty Division, and Andrew King, Kelle Hinderer, and Robert K. Lowe, Assistant Public Defenders, for appellant.

_____